Strafford
No. 92-231

ROBERT H. SIMPSON, JR.

v.

CHRISTOPHER CALIVAS

September 21, 1994

*Wiggin & Nourie, P.A.,* of Manchester (*Dennis T. Ducharme* on the briefs and orally), for the plaintiff.

*Nelson, Kinder, Mosseau & Gordon, P.C.,* of Manchester (*Richard C. Nelson* and *Peter G. Beeson* on the brief, and *Mr. Beeson* orally; *William C. Saturley* on the supplemental brief and orally at rehearing), for the defendant.

HORTON, J. The plaintiff, Robert H. Simpson, Jr., appeals from a directed verdict, grant of summary judgment, and dismissal of his claims against the lawyer who drafted his father's will. The plaintiff's action, sounding in both negligence and breach of contract, alleged that the defendant, Christopher Calivas, failed to draft a will which incorporated the actual intent of Robert H. Simpson, Sr. to leave all his land to the plaintiff in fee simple. Sitting with a jury, the Superior Court (*Dickson,* J.) directed a verdict for the defendant based on the plaintiff's failure to introduce any evidence on damages or breach of duty. The trial court also granted summary judgment on collateral estoppel grounds based on findings of the Strafford County Probate Court and dismissed the action, ruling that under New Hampshire law an attorney who drafts a will owes no duty to intended beneficiaries. We reverse and remand.

In March 1984, Robert H. Simpson, Sr. (Robert Sr.) executed a will that had been drafted by the defendant. The will left all real estate to the plaintiff except for a life estate in "our *homestead* located at Piscataqua Road, Dover, New Hampshire" (emphasis added), which was left to Robert Sr.'s second wife, Roberta C. Simpson (stepmother). After Robert Sr.'s death in September 1985, the plaintiff and his stepmother filed a joint petition in the Strafford County Probate Court seeking a determination, essentially, of whether the term "homestead" referred to all the decedent's real property on Piscataqua Road (including a house, over one hundred acres of land, and buildings used in the family business), or only to the house (and, perhaps, limited surrounding acreage). The probate court found the term "homestead" ambiguous, and in order to aid construction, admitted some extrinsic evidence of the testator's surrounding circumstances, including evidence showing a close relationship between Robert Sr. and plaintiff's stepmother. The probate court, however, did not admit notes taken by the defendant during consultations with Robert Sr. that read: "House to wife as a life estate remainder to son, Robert H. Simpson, Jr. . . . Remaining land . . . to son Robert A. [sic] Simpson, Jr." The probate court construed the will to provide Roberta with a life estate in all the real property. After losing the will construction action—then two years after his father's death—the plaintiff negotiated with his stepmother to buy out her life estate in all the real property for $400,000.

The plaintiff then brought this malpractice action, pleading a contract count, based on third-party beneficiary theory, and a negligence count. At trial, the plaintiff presented evidence, including the defendant's notes and testimony of some of Robert

Sr.'s friends and acquaintances, to show that Robert Sr. had intended that his son take the buildings used in the family business and the bulk of the land in fee simple. The trial court, however, sustained objections to the plaintiff's three attempts to introduce evidence on damages. First, it refused to allow the plaintiff to testify as to the $400,000 he paid to buy out his stepmother. Second, it refused to allow the plaintiff's expert on damages to testify, ruling that he had not been properly disclosed as an expert during discovery. Finally, it refused to admit appraisal values contained in the probate inventory. With no evidence on damages before the jury at the end of the plaintiff's case, the trial court directed a verdict for the defendant. Further, it directed a verdict on the reasoning that the plaintiff had failed to introduce any evidence of intent that conflicted with the terms of the will as construed.

The plaintiff raises three issues on appeal: (1) whether the trial court erred in ruling that under New Hampshire law a drafting attorney owes no duty to an intended beneficiary; (2) whether the trial court erred in ruling that the findings of the probate court on testator intent collaterally estopped the plaintiff from bringing a malpractice action; and (3) whether the trial court erred in excluding the plaintiff's proffered damages evidence.

In an opinion dated November 23, 1993, we reversed and remanded. The defendant moved for rehearing. *See* SUP. CT. R. 22. We granted the motion, withdrew our opinion, and ordered rebriefing and reargument. We reverse and remand.

## I. Duty to Intended Beneficiaries

■ In order to recover for negligence, a plaintiff must show that "there exists a duty, whose breach by the defendant causes the injury for which the plaintiff seeks to recover." *Goodwin v. James,* 134 N.H. 579, 583, 595 A.2d 504, 507 (1991). The critical issue, for purposes of this appeal, is whether an attorney who drafts a testator's will owes a duty of reasonable care to intended beneficiaries. We hold that there is such a duty.

As a general principle, "the concept of 'duty' . . . arises out of a relation between the parties and the protection against reasonably foreseeable harm." *Morvay v. Hanover Insurance Co.,* 127 N.H. 723, 724, 506 A.2d 333, 334 (1986). The existence of a contract between parties may constitute a relation sufficient to impose a duty to exercise reasonable care, but in general, "the scope of such a duty is limited to those in privity of contract with each other." *Robinson v. Colebrook Savings Bank,* 109 N.H. 382, 385, 254 A.2d 837, 839 (1969). The privity rule is not ironclad, though, and we

have been willing to recognize exceptions particularly where, as here, the risk to persons not in privity is apparent. *Id*. In *Morvay*, for example, we held that investigators hired by an insurance company to investigate the cause of a fire owed a duty to the insureds to perform their investigation with due care despite the absence of privity. Accordingly, the insureds stated a cause of action by alleging that the investigators negligently concluded that the fire was set, thereby prompting the insurance company to deny coverage. *Morvay*, 127 N.H. at 726, 506 A.2d at 335; *see also Spherex, Inc. v. Alexander Grant & Co.*, 122 N.H. 898, 451 A.2d 1308 (1982) (accountants may be liable in negligence to those who reasonably rely on their work despite lack of privity); *Robinson*, 109 N.H. 382, 254 A.2d 837 (bank owes duty to beneficiary of account with survivorship feature set up by depositor).

■ Because this issue is one of first impression, we look for guidance to other jurisdictions. The overwhelming majority of courts that have considered this issue have found that a duty runs from an attorney to an intended beneficiary of a will. R. MALLEN & J. SMITH, LEGAL MALPRACTICE 3D. § 26.4, at 595 (1989 & Supp. 1992); *see, e.g., Stowe v. Smith*, 441 A.2d 81 (Conn. 1981); *Needham v. Hamilton*, 459 A.2d 1060 (D.C. 1983); *Ogle v. Fuiten*, 466 N.E.2d 224 (Ill. 1984); *Hale v. Groce*, 744 P.2d 1289 (Or. 1987). A theme common to these cases, similar to a theme of cases in which we have recognized exceptions to the privity rule, is an emphasis on the foreseeability of injury to the intended beneficiary. As the California Supreme Court explained in reaffirming the duty owed by an attorney to an intended beneficiary:

> When an attorney undertakes to fulfil the testamentary instructions of his client, he realistically and in fact assumes a relationship not only with the client but also with the client's intended beneficiaries. The attorney's actions and omissions will affect the success of the client's testamentary scheme; and thus the possibility of thwarting the testator's wishes immediately becomes foreseeable. Equally foreseeable is the possibility of injury to an intended beneficiary. In some ways, the beneficiary's interests loom greater than those of the client. After the latter's death, a failure in his testamentary scheme works no practical effect except to deprive his intended beneficiaries of the intended bequests.

*Heyer v. Flaig*, 449 P.2d 161, 164–65 (Cal. 1969). We agree that although there is no privity between a drafting attorney and an

intended beneficiary, the obvious foreseeability of injury to the beneficiary demands an exception to the privity rule.

■ The defendant in his brief, however, urges that if we are to recognize an exception to the privity rule, we should limit it to those cases where the testator's intent *as expressed in the will*—not as shown by extrinsic evidence—was frustrated by attorney error. *See Kirgan v. Parks,* 478 A.2d 713, 719 (Md. Ct. Spec. App. 1984) ("testamentary beneficiary . . . has no cause of action against the testator's attorney for alleged negligence in drafting the will when . . . the will is valid, the testamentary intent *as expressed in the will* has been carried out, and there is no concession of error by the attorney"), *cert. denied,* 484 A.2d 274 (Md. 1984); *see also Ventura Cty. Humane Soc. for P. C. C. & A., Inc. v. Holloway,* 115 Cal. Rptr. 464 (Ct. App. 1974); *Espinosa v. Sparber, Shevin, Shapo, Rosen & Heilbronner,* 586 So. 2d 1221, 1223 (Fla. Dist. Ct. App. 1991); *Schreiner v. Scoville,* 410 N.W.2d 679, 683 (Iowa 1987). Under such a limited exception to the privity rule, a beneficiary whose interest violated the rule against perpetuities would have a cause of action against the drafting attorney, but a beneficiary whose interest was omitted by a drafting error would not. Similarly, application of such a rule to the facts of this case would require dismissal even if the allegations—that the defendant botched Robert Sr.'s instructions to leave all his land to his son—were true. We refuse to adopt a rule that would produce such inconsistent results for equally foreseeable harms, and hold that an intended beneficiary states a cause of action simply by pleading sufficient facts to establish that an attorney has negligently failed to effectuate the testator's intent as expressed to the attorney.

We are not the only court to reject the distinction urged by the defendant. In *Ogle v. Fuiten,* 466 N.E.2d at 225, for example, nephews of the testator sued the testator's attorney for failing to provide in the will for the possibility that the testator's wife might not die in a common disaster, but might nonetheless fail to survive him by thirty days. The testator's wife died in the period not dealt with in the will, and without a provision in the will providing for this situation, the estate devolved by intestacy. On appeal after the dismissal of the nephews' claims, the court flatly rejected the argument that intended beneficiaries do not state a cause of action where the testator's alleged intent does not appear in the will. *Id.* at 227; *see also Teasdale v. Allen,* 520 A.2d 295, 296 (D.C. 1987) (expressly rejecting *Kirgan* and *Ventura*); *cf. Stowe v. Smith,* 441 A.2d 81 (Conn. 1981); *Needham v. Hamilton,* 459 A.2d 1060 (D.C. 1983); *Hale v. Groce,* 744 P.2d 1289 (Or. 1987).

The plaintiff also argues that the trial court erred in failing to recognize that the writ stated a cause of action in contract. We agree.

■ The general rule that a nonparty to a contract has no remedy for breach of contract is subject to an exception for third-party beneficiaries. *Arlington Trust Co. v. Estate of Wood,* 123 N.H. 765, 767, 465 A.2d 917, 918 (1983). Third-party beneficiary status necessary to trigger this exception exists where "the contract is so expressed as to give the promisor reason to know that a benefit to a third party is contemplated by the promisee as one of the motivating causes of his making the contract." *Tamposi Associates, Inc. v. Star Market Co.,* 119 N.H. 630, 633, 406 A.2d 132, 134 (1979). We hold that where, as here, a client has contracted with an attorney to draft a will and the client has identified to whom he wishes his estate to pass, that identified beneficiary may enforce the terms of the contract as a third-party beneficiary. *See Stowe v. Smith,* 441 A.2d at 84; *Ogle v. Fuiten,* 466 N.E.2d at 227; *Hale v. Groce,* 744 P.2d at 1292.

Because we hold that a duty runs from a drafting attorney to an intended beneficiary, and that an identified beneficiary has third-party beneficiary status, the trial court erred by dismissing the plaintiff's writ.

## II. Collateral Estoppel

The defendant insists, however, that even if a duty runs from a testator's attorney to an intended beneficiary, the superior court properly granted summary judgment on collateral estoppel grounds. We disagree.

■ The elements of collateral estoppel are well-established: "the issue subject to estoppel must be identical in each action, the first action must have resolved the issue finally on the merits, and the party to be estopped must have appeared in the first action, or have been in privity with someone who did so." *Daigle v. City of Portsmouth,* 129 N.H. 561, 570, 534 A.2d 689, 693 (1987). Further, the party to be estopped must have had a full and fair opportunity to litigate the issue, *id.,* and the finding must have been essential to the first judgment. RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1980); *cf. Ainsworth v. Claremont,* 108 N.H. 55, 56, 226 A.2d 867, 869 (1967) (collateral estoppel only applicable to those matters "directly in issue").

The thrust of defendant's collateral estoppel argument is as follows. The probate court found that the will as enforced represented Robert Sr.'s *actual* intent. Thus, the crux of both the negligence and contract counts—that the will did not reflect

Robert Sr.'s actual intent—was already decided in the probate court. In support of this argument, the defendant points out that the probate court considered not only the four corners of the will, but also extrinsic evidence of Robert Sr.'s "circumstances." The defendant further insists that upon proper proffer, the plaintiff even could have introduced the notes of the defendant that recorded Robert Sr.'s direct declarations of intent at their conference. In sum, the defendant argues, the probate court either did consider or could have considered all of the evidence of actual intention that the superior court was entitled to hear.

The primary question is whether the issues before the probate and superior courts were identical. We agree with defendant that comparison of the respective evidence which each court was competent to hear is one factor, but note that an identity of evidence is not dispositive of an identity of issues. Instead, determination of "identity" necessarily requires inquiry into each court's role and the nature of the respective findings.

■■ The principal task of the probate court is to determine the testator's intent, *In the Matter of Shirley's Estate*, 117 N.H. 922, 923, 379 A.2d 1261, 1262 (1977), limited by the requirement that it determine the "intention of the testator *as shown by the language of the whole will . . . .*" *Dennett v. Osgood*, 108 N.H. 156, 157, 229 A.2d 689, 690 (1967) (emphasis added). In this effort, the probate court is always permitted to consider the "surrounding circumstances" of the testator, *id.; Royce v. Denby's Estate*, 117 N.H. 893, 379 A.2d 1256 (1977), and where the terms of a will are ambiguous, as here, extrinsic evidence may be admitted to the extent that it does not contradict the express terms of the will. *In re Estate of Sayewich*, 120 N.H. 237, 242, 413 A.2d 581, 584 (1980). Direct declarations of a testator's intent, however, are generally inadmissible in all probate proceedings. *Id.*; 4 PAGE ON THE LAW OF WILLS § 32.9 (Bowe-Parker ed. 1961). The defendant argues that even though his notes of his meeting with the decedent recorded the decedent's direct declarations of intent, they could have been admissible as an exception to the general rule had there been a proper proffer. We need not reach the issue of whether the defendant's notes fall within an exception to the general rule because even assuming admissibility and therefore an identity of evidence, there remain distinct issues. Quite simply, the task of the probate court is a limited one: to determine the intent of the testator *as expressed in the language of the will*. Obviously, the hope is that the application of rules of construction and consideration of extrinsic evidence (where authorized) will produce a finding of expressed intent that corresponds to actual intent.

Further, the likelihood of such convergence presumably increases as the probate court considers more extrinsic evidence; however, even with access to all extrinsic evidence, there is no requirement or guarantee that the testator's intent as construed will match the testator's actual intent.

■ The defendant, however, insists that whether or not required to do so, the probate court in this case did make an explicit finding of actual intent when it concluded: "There is nothing to suggest that [the testator] intended to grant a life estate in anything less than the whole." We need not reach the issue of whether this language constitutes a finding of actual intent because collateral estoppel will not lie anyway. Collateral estoppel is only applicable if the finding in the first proceeding was essential to the judgment of that court. RESTATEMENT (SECOND) OF JUDGMENTS § 27. Inasmuch as the mandate of the probate court is simply to determine and give effect to the intent of the testator as expressed in the language of the will, a finding of actual intent is not necessary to that judgment. Accordingly, even an explicit finding of actual intent by a probate court cannot be the basis for collateral estoppel.

## III. Evidence of Damages

■ We now turn to the issue of whether the trial court properly directed a verdict for the defendant at the end of the plaintiff's case. We note that the ruling rested on alternative grounds—failure to introduce evidence of breach of a duty and failure to introduce evidence of damages—and accordingly we must affirm if either basis was sound. The trial court may only direct a verdict where it determines, after considering all evidence in a light most favorable to the non-movant, that "no rational juror could conclude that the non-moving party is entitled to relief." *Goodwin v. James,* 134 N.H. at 582, 595 A.2d at 506. We need not look beyond the defendant's notes of his meeting with Robert Sr. to hold that the trial court erred in directing a verdict on the ground of no evidence of breach. The trial court, however, also directed a verdict on the ground that there was no evidence of damages. We need not determine whether a directed verdict is proper where there is no evidence on damages, *cf. Pugliese v. Town of Northwood,* 119 N.H. 743, 751, 408 A.2d 113, 118 (1979), because we hold that the trial court erred in excluding the appraisal values in the probate inventory.

The plaintiff sought to introduce, as evidence of damages, appraisal values in a probate inventory that was prepared by Gregory Koutrelakos, a real estate appraiser, and filed with the

probate court. Koutrelakos had been selected and authorized by the probate court to conduct the inventory and appraisal. The appraisal valued Robert H. Simpson, Sr.'s total real property holdings at $466,080: $90,000 for the house and two surrounding acres not in dispute, and $376,080 for the rest in dispute. The plaintiff offered the probate inventory under the public records exception to the hearsay rule, which, in civil actions, authorizes the admission of "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth . . . factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." N.H. R. Ev. 803(8)(c). The trial court ruled that the probate inventory was admissible to show the contents of the estate, but that the corresponding appraisal values were inadmissible for three reasons: (1) they were "hearsay within hearsay" and no hearsay exception reached the second tier of hearsay; (2) they were irrelevant, or, if relevant, any probative value was substantially outweighed by the risk of unfair prejudice and confusion; and (3) under authority of *Holmes v. State,* 109 N.H. 319, 251 A.2d 320 (1969), they were too unreliable. The defendant argues that the trial court could have properly excluded the appraisal values on any of these grounds. We disagree.

The trial court ruled that the probate inventory was admissible under the public records exception to the hearsay rule to show the contents of the estate. Implicitly, then, the trial court agreed that the basic predicates of New Hampshire Rule of Evidence 803(8)(c) were met with respect to the entire document; namely, that the probate inventory was a public record containing findings made pursuant to an investigation authorized by law. *Cf.* 4 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶ 803(8)[03], at 803–250 to –252 (1993) ("factual findings" includes opinions recorded in public record). On appeal, the defendant does not dispute that these general predicates were met, instead arguing that other factors unique to the appraisal values preclude their admissibility.

The defendant argues that the appraisal values in the probate inventory are "hearsay within hearsay" and that no exception exists for the second tier of hearsay. This reasoning is flawed inasmuch as there is no second tier of hearsay. The appraisal values are the findings of Koutrelakos, who was the "declarant" in the probate inventory. In other words, while "single-tier" hearsay exists because the probate inventory contains his out-of-court statements, there is no "hearsay within hearsay" because Koutrelakos' report does not include the statements of any third

person. *Cf. Abbott v. Insurance Co.,* 89 N.H. 149, 152–53, 195 A. 413, 415 (1937) (death certificate admissible not only to show fact of death, but also cause of death). *See generally* 2 J. STRONG, MCCORMICK ON EVIDENCE § 324.1 (1992).

 The defendant next argues that the trial court acted within its discretion in finding that the probate appraisal was not relevant or that its probative value was outweighed by the potential for unfair prejudice and confusion. We disagree. The defendant's main argument is that while the plaintiff claims damages for the stepmother's *life estate* in the disputed portion of the real estate, the appraisal only valued the *fee*. However,

> a party offers his evidence not *en masse,* but item by item. An item of evidence, being but a single link in the chain of proof, need not prove conclusively the proposition for which it is offered. It need not even make that proposition appear more probable than not. Whether the entire body of one party's evidence is sufficient to go to the jury is one question. Whether a particular item of evidence is relevant to his case is quite another. It is enough if the item could reasonably show that a fact is slightly more probable than it would appear without that evidence. . . . *A brick is not a wall.*

1 MCCORMICK, *supra* § 185, at 776 (emphasis added); *see also* 1 WEINSTEIN'S EVIDENCE, *supra* ¶ 401[06], at 401–38 to –39. A well-accepted method of determining the value of a life estate is to first determine the value of the fee, and then, knowing the age of the holder of the life estate, to look to published tables that contain life estate and remainder fractions. *See, e.g.,* 26 C.F.R. § 20.2031-7(f) (1993) (tables compiled by Treasury Department). As the defendant conceded at oral argument, a trial court can take judicial notice of such tables, *see* N.H. R. EV. 201; *cf.* SUPER. CT. R. 63A (life expectancy tables admissible), making unnecessary the time-consuming presentation of equivalent information through experts. In the present case, therefore, if there were evidence of the stepmother's age and the fee value of the property in dispute, valuation of the life estate should only have required basic computation. The plaintiff's main task with respect to damages, then, was to present evidence of the value of the fee. This is precisely what the probate appraisals would have done, and for that reason their probative value is overwhelming.

Finally, we consider *Holmes v. State,* 109 N.H. 319, 251 A.2d 320, which sharply questions the reliability of probate inventory appraisals and their use in proceedings where the fair market

value of real property is at issue. A preliminary question exists as to whether *Holmes* survives the adoption in this State of the rules of evidence. We hold that it does. First, Rule 803(8)(c) provides even if the other predicates are met, public records should not be admitted if otherwise unreliable. It is precisely this reliability concern to which *Holmes* speaks. Further, the reporter's notes to Rule 803 indicate that *Holmes'* continued vitality, through Rule 803(8)(c)'s reliability requirement, was contemplated. In sum, *Holmes* remains good law, and we thus must determine whether it supports exclusion of the appraisal values. We hold that it does not.

In *Holmes,* an eminent domain case, the State introduced appraisal values contained in a probate inventory as proof of the fair market value of the real estate it had taken. This court analogized the use of probate appraisals to tax assessments, explaining:

> In the absence of a statute permitting it . . . , the assessed valuation of property for tax purposes is not admissible as evidence of value in a condemnation proceeding or other action where value is a central issue. The appraisal in a probate inventory is seldom a more reliable index of value than a tax assessment and the introduction of such evidence is erroneous . . . .

*Holmes,* 109 N.H. at 320–21, 251 A.2d at 321. The court went on, however, to consider the question of the reliability of the particular probate inventory appraisal at issue. Pointing out, *inter alia,* that the appraisal was conducted by an attorney instead of a real estate expert, that the "appraiser" had not seen the property and was not familiar with market values in that locale, and that precise valuation was not necessary for tax purposes or for determining distribution of the estate, the court concluded that the particular probate appraisal was not a reliable index of value and, accordingly, should not have been admitted.

The defendant argues that the quoted language from *Holmes* categorically prohibits the admission of probate inventory appraisals to establish the value of real property; the plaintiff, on the other hand, argues that *Holmes* is limited to its facts and that the exclusion of the appraisal was based on its particular lack of reliability. We heed the concern expressed in *Holmes* about the frequent unreliability of probate appraisals, but we think it unwise to embrace a categorical rule that refuses to recognize that probate appraisals can ever be sufficiently reliable to merit admissibility. Parties seeking to introduce probate appraisals should have to

overcome a strong presumption of unreliability, but ultimately, and on a case-by-case basis, the trial court must determine if that presumption has been overcome.

The trial judge, however, did not make clear whether he understood *Holmes* as categorically prohibiting admission of probate appraisals, or whether he was making a specific finding that the particular appraisal was unreliable, explaining only that "I think that the *Holmes* case is also in further support of my ruling." We assume, however, that the trial court properly construed *Holmes,* and that instead it made a specific finding of unreliability. While we must uphold such a finding if it is not clearly erroneous, *see State v. Killam,* 137 N.H. 155, 160, 626 A.2d 401, 404 (1993), here there was clear error.

Koutrelakos was a court-appointed real estate appraiser. His business was based in Dover, the same city in which the bulk of the real estate was located. As part of the appraisal process, Koutrelakos personally inspected the real property, which included two parcels. The first parcel contained 99.7 acres of land, the house, a building known as "Simpson's Pavilion," and six other buildings for "garage, storage, etc." The second parcel contained 20.5 acres of land. Koutrelakos used a comparable sales method to estimate the value of the house and two acres, and a replacement-cost formula coupled with depreciation allowances to estimate the value of the remaining buildings (using, for example, a $15 per square foot replacement cost for the pavilion, $7 for a metal barn, $10 for two wood-frame barns, and $10 for an office building). For purposes of estimating the value of the remaining acreage (less two acres with the house and three acres with the pavilion) in parcel 1, he analyzed recent local sales of large tracts of unimproved land to calculate a per acre worth of $2000; using a similar approach for parcel 2, Koutrelakos calculated a per acre worth of $7000 (the higher cost reflecting river frontage). In sum, a careful review of Koutrelakos' probate appraisal leaves little question as to its thoroughness and reliability, and any finding to the contrary would be clearly erroneous.

■■■ While our reversal of the trial court's directed verdict rests on the improper exclusion of the probate appraisal, because we remand this case, we will address other issues raised on appeal that are likely to arise on remand. The exclusion of Koutrelakos' live testimony should not be an issue on remand provided he is disclosed as an expert. Next, we consider the trial court's refusal to allow the plaintiff to testify as to the $400,000 he paid his stepmother for her life estate in all the real property two years after the testator's death. The trial court ruled that this evidence

was not probative as to what it characterized as the proper issue of damages: the date of death fair market value of a life estate in the real property other than the house (and, perhaps, limited surrounding acreage). As a preliminary matter, we agree with the trial court's definition of damages. *See* RESTATEMENT (SECOND) OF CONTRACTS § 347 (1979); RESTATEMENT (SECOND) OF TORTS §§ 906, 911 (1977); 5 A. CORBIN, CONTRACTS §§ 1002, 1004 (1964). While we have approved of the admission of testimony of plaintiffs as to the value of their property, *Joslin v. Pine River Development Corp.,* 116 N.H. 814, 818, 367 A.2d 599, 602 (1976); *Roy v. State,* 104 N.H. 513, 517, 191 A.2d 522, 525 (1963), trial courts enjoy broad discretion with respect to the admission of such testimony. *See Joslin,* 116 N.H. at 818, 367 A.2d at 602. Where, as here, the sale was two years after the valuation date and *voir dire* of the plaintiff revealed his confusion, including that he had no knowledge of the separate components of that price, we would be unwilling to find an abuse of discretion.

*Reversed and remanded.*

All concurred.