Hugel v. Milberg, Weiss, et al.     CV-97-417-M    03/24/98

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


Max Hugel,


    v.                                    Civil No. 97-417-M

Milberg, Weiss, Bershad, Hynes
& Lerach, LLP; Gold, Bennett & Cera, LLP;
Shapiro, Haber & Urmy, LLP; Wolf, Popper, LLP.


### O R D E R


    Plaintiff, Max Hugel, complains that he was defamed in pleadings filed in a securities fraud lawsuit, a suit to which he was not party.  Four law firms that represent plaintiffs in the securities action are named as defendants: Gold, Bennett & Cera, LLP, ("GB&C"); Milberg, Weiss, Bershad, Hynes & Lerach, LLP, ("Milberg"); Shapiro, Haber & Urmy, LLP, ("SH&U"); and Wolf, Popper, LLP, ("WP").  Hugel also brings claims of legal malpractice against the defendants and seeks enhanced compensatory damages.  Defendants have filed motions to dismiss for lack of personal jurisdiction and for failure to state actionable claims, and plaintiff moves to certify questions to the Supreme Court of New Hampshire.


### BACKGROUND

    Plaintiff's complaint is based on allegedly defamatory statements made in a consolidated complaint filed in this court in Berke v. Presstek, Inc. et al., Civil Action No. 96-347-M ("Presstek").  Presstek is a consolidated, multi-district

securities fraud suit that began in June 1996, when SH&U filed a class action suit on behalf of Presstek's stockholders. Shortly thereafter, the other defendant law firms separately filed a series of different lawsuits against Presstek on behalf of other plaintiffs also alleging securities violations. After the separate actions were consolidated in this district, the defendant firms filed a consolidated amended complaint.

The consolidated amended complaint alleged, among other things, that Robert Howard, who served as a Presstek director in the late 1980's and received a fee from Presstek in 1995 for consulting services, sold shares of Presstek stock during the class period at artificially inflated prices, based on material non-public information. The complaint also discussed Howard's "history of suspect stock activity" dating back to the 1970's, including Howard's activities when he ran Centronics Computer Data Corporation.

Hugel alleges that references to him in the section of the complaint discussing Howard's activities were defamatory. Specifically, Hugel points to the following statements:

> a. Defendant Robert Howard's history of suspect stock activity dates back to the 1970s (sic). At that time, Robert Howard ran Centronics Computer Data Corp. ("Centronics"). Robert Howard founded Centronics, a manufacturer of printers, acting as President and Chairman of the Board of Centronics from 1969 to 1980, and resigning from its Board of Directors in 1983 . . .
> b. Robert Howard's activities in Centronics stock included accusations that in 1974 **reputed organized crime figure Max Hugel** purchased successive blocks of Centronics stock to create the appearance of activity in the stock and that Howard returned the favor by buying 15,000 shares of Brother International, of which Hugel was

2

president, in five separate purchases.  According to
The Washington Post, **Hugel also acted as executive vice
president of Centronics, which had a consultancy
relationship in the 1960s (sic) with reputed organized
crime figure Moe B. Dalitz** and his Las Vegas casino
properties.  Also according to the Washington Post,
Centronics was at one time partly owned by Caesar's
World, a Las Vegas casino frequently subject to federal
organized crime investigations . . .  Further according
to The Washington Post, **Hugel secretly loaned
substantial amounts of money, apparently hundreds of
thousands of dollars, to the New York securities firm
that was the market maker for Brother International
stock to be used to purchase the stock in the market,
creating the false** appearance of trading activity and
artificially increasing the price of Brother
International stock; simultaneously **Hugel covertly
provided inside information** about both Brother
International and Centronics to the securities firm to
assure its profit from trading in the stock. (emphasis
added)

Hugel's complaint at ¶ 33.   The Presstek complaint also alleges
that some of the Presstek defendants regularly spoke with Hugel
in connection with their market manipulations of Presstek stock.

Within thirty days after filing the consolidated complaint,
the Presstek plaintiffs filed a Substituted Consolidated Amended
Class Action Complaint and Demand for Jury Trial that omitted the
allegedly defamatory statements regarding Hugel.  At the same
time, the Presstek plaintiffs withdrew the original consolidated
complaint from this court's record, with court approval.

Hugel complains that all of the statements made about him
were false.  He particularly objects to the characterization of
him as a "reputed organized crime figure" and to assertions that
he engaged in criminal activity, including secretly loaning money
to a securities firm in order to purchase shares of a particular
stock, thereby creating the false appearance of trading activity.

3

According to Hugel, who is not a defendant in the Presstek action, the references to him in the Presstek complaint were entirely unrelated to the Presstek plaintiffs' securities claims and were made solely to impugn his character and, by association, the character of the Presstek defendants. Hugel also points out that he owns a forty percent interest in a New Hampshire racetrack, a sensitive and highly regulated industry. Hugel argues that his good reputation in New Hampshire is critical to his ability to successfully continue in that business and to engage in other business dealings. Hugel alleges that his good reputation has been severely damaged by the statements published by defendants in the Presstek consolidated complaint.

## DISCUSSION

Defendants move to dismiss plaintiff's claims alleging defamation, legal malpractice, and seeking enhanced compensatory damages. A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is one of limited inquiry, focusing not on "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). In considering a motion to dismiss, the court accepts all well-pleaded facts as true and resolves all reasonable inferences in favor of the nonmoving party. Washington Legal Found. v. Massachusetts Bar Found., 993 F.2d 962, 971 (1st Cir. 1993). "[I]f, under any theory, the allegations are sufficient to state a cause of action

4

in accordance with the law, we must deny the motion to dismiss." Vartanian v. Monsanto Co., 14 F.3d 697, 700 (1st Cir. 1994).


## A.   **Defamation Claim**

Defendants move to dismiss Hugel's defamation claim on grounds that the allegedly defamatory statements in the prior complaint were absolutely privileged, and therefore, are not actionable.

In New Hampshire, the well-settled rule is that "statements made in the course of judicial proceedings are absolutely privileged from civil actions, provided they are pertinent to the subject of the proceeding." McGranahan v. Dahar, 119 N.H. 758, 763 (1979)(citing Massachusetts law).  By requiring that the statements be pertinent or relevant to the action in which they were filed, the rule ensures that statements made needlessly or wholly in bad faith will not be protected. See id.  The rationale underlying the rule is that "the potential harm to an individual is far outweighed by the need to encourage participants in litigation, parties, attorneys, and witnesses, to speak freely in the course of judicial proceedings." Id. Whether a particular statement is pertinent or relevant to a judicial proceeding, and therefore privileged, is a legal question to be resolved by the court. Id. at 766.

A statement is presumed to be "pertinent" or "relevant" to the proceeding unless the person about whom the statement is made "demonstrates that [the statement] was so palpably irrelevant to

5

the subject matter of the controversy that no reasonable [person] can doubt its irrelevancy or impropriety."  Id.; see also Leavitt v. Bickerton, 855 F. Supp. 455, 456-457 (D. Mass. 1994) (interpreting Massachusetts law and noting that "pertinence" need not follow evidentiary rules as to admissibility).  Although the privilege will not protect "one who uses the form of a judicial proceeding merely as a pretext for circulating defamatory material," all doubts are to be resolved in favor of pertinency and application of the privilege.  McGranahan, 119 N.H. at 766.

The allegation that Hugel spoke regularly with a Presstek defendant in connection with the manipulation of the price of Presstek stock is of course directly related to the underlying securities fraud allegations and need not be considered further.  The "pertinence" or "relevance" of the remaining challenged statements must be assessed in light of the requirement that the Presstek plaintiffs plead the securities fraud claims with sufficient "particularity" and with sufficient factual background to demonstrate the requisite intent.  Fed. R. Civ. P. 9(b); 15 U.S.C.A. § 78u-4(b)(1) and (2).

Most of the remaining statements about Hugel directly relate to whether Howard (one of Presstek's directors and a named defendant in the Presstek litigation) engaged in unlawful manipulation of stocks before Howard came to Presstek.  It is at least arguable that the allegations about Howard's and Hugel's prior joint involvement in alleged fraudulent securities transactions might be pertinent to Howard's knowledge or intent

6

(absence of mistake) in committing the securities fraud alleged in Presstek.

The allegations that Hugel was a "reputed organized crime figure," that he was vice president of Centronics, that another reputed organized crime figure and owner of Las Vegas casinos had a consulting relationship with Centronics, and that Hugel manipulated stock values at Brother International and Centronics for the benefit of a New York securities firm seem more tenuously related to the Presstek securities fraud claims. At least some of those allegations approach the protective limit of the privilege. Nevertheless, even those doubtfully pertinent allegations can be broadly construed as background information describing alleged associations and activities of participants in the securities fraud claims — not relevant or admissible evidence perhaps, but not "so palpably irrelevant to the subject matter of the controversy that no reasonable [person] can doubt [their] irrelevancy or impropriety." McGranahan, at 766 (citation omitted). Since the complaint alleges that Presstek defendants spoke with Hugel regularly about stock manipulations, Hugel's related activities and reputation could be pertinent to the Presstek defendants' knowledge and intent relative to their own alleged stock fraud.[1]

---

[1] In reaching these conclusions about the possible relevance of statements concerning Hugel, the court is, of course, not making evidentiary rulings.

7

Although these are close questions, resolving doubt in favor of the privilege, as New Hampshire law requires, the court is satisfied that the Presstek complaint was not employed as a vehicle or pretext for circulating defamatory statements about Hugel, and, that the challenged statements are, in context, sufficiently pertinent to the underlying Presstek action to come within the very broad protection afforded by the absolute civil pleadings privilege. Accordingly, as the challenged statements in the Presstek complaint are absolutely privileged, Hugel's defamation claim based on those statements must be dismissed.

**B.    Legal Malpractice Claims**

Hugel also alleges that the defendant law firms had a legal duty, arising from their attorney-client relationship with the Presstek plaintiffs and applicable rules of professional conduct, "to refrain from acting to cause foreseeable harm to plaintiff Hugel." Hugel further alleges that "defendants had a duty to refrain from making statements that had no substantial purpose other than to embarrass, burden or harass the Plaintiff and unjustly enrich themselves." In a separate count, Hugel alleges that defendant law firm Milberg, because of its attorney-client relationship with its Presstek clients, had a legal duty "to refrain from acting to cause foreseeable harm to the Plaintiff Hugel." That duty, Hugel alleges, is imposed, in part, by Federal Rule of Civil Procedure 11, requiring Milberg "to reasonably investigate the allegations made in the consolidated

8

Amended Complaint, and to ensure that those allegations were well grounded in fact." Hugel acknowledges that the Supreme Court of New Hampshire has yet to hold that an attorney owes a legal duty to third parties, except in the context of third-party beneficiaries of the lawyer-client relationship. Hugel asks that the question of legal malpractice, in the context of his claims, be certified to the New Hampshire Supreme Court.

Certification is unnecessary in this case.[2] Although the third-party duty issue raised by Hugel has not been addressed by the New Hampshire Supreme Court, existing New Hampshire law leaves little doubt that the court would decline to find such a duty in this case.

Hugel's legal malpractice claim is little more than a recharacterization of his defamation claim, cast as negligence rather than libel. It is well-established in New Hampshire law that courts look to the substance, not the title or form, of a claim to determine its underlying legal theory. See, e.g., Kantor v. Norwood Group, Inc., 127 N.H. 831, 834 (1986) (quoting Guerin v. N.H. Catholic Charities, 120 N.H. 501, 505 (1980)). In essence, Hugel's "malpractice" claims assert that he was defamed by allegations in the Presstek complaint. A defamation claim

_____

[2] Certification of a question to a state's highest court is a discretionary decision. Lehman Bros. v. Schein, 416 U.S. 386, 391 (1974); Nieves ex rel Nieves v. University of Puerto Rico, 7 F.3d 270, 275 (1st Cir. 1993). When state law is sufficiently clear to allow this court to predict its course, certification is both inappropriate and an unwarranted burden on the state court. Armacost v. Amica Mut. Ins. Co., 11 F.3d 267, 269 (1st Cir. 1993).

masked as a legal malpractice claim is, nevertheless, still a defamation claim.

In addition, to state a negligence claim, Hugel must plausibly allege the breach of a recognized legal duty, <u>Simpson v. Calivas</u>, 139 N.H. 1, 4 (1994), and he has not identified any cognizable legal duty owed by the defendant law firms to <u>him</u>.[3] Whether an enforceable duty exists under New Hampshire law is a legal question that focuses on the relationship between the parties, policy issues attendant to their relationship, and the foreseeability of harm. <u>See, e.g.</u> <u>Marquay v. Eno</u>, 139 N.H. 708, 716 (1995); <u>Walls v. Oxford Management Co.</u>, 137 N.H. 653, 656-57 (1993); <u>Island Shores Estates v. Concord</u>, 136 N.H. 300, 304 (1992). In general, the New Hampshire Supreme Court has been reluctant to broaden the scope of negligence liability by imposing unexpected or remote liability on defendants.[4] <u>See, e.g.</u>, <u>Bruzga v. PMR Architects</u>, 141 N.H. 756, 759 (1997); <u>Williams v. O'Brien</u>, 140 N.H. 595, 599 (1995).

In the area of legal malpractice, the New Hampshire Supreme Court has found an enforceable duty owed by an attorney to the

---

[3] Neither the Federal Rules of Civil Procedure nor the New Hampshire Rules of Professional Conduct provide substantive rights that would support Hugel's claims. <u>See</u> 28 U.S.C.A. § 2072; <u>New York News, Inc. v. Kheel</u>, 972 F.2d 482, 486 (2d Cir. 1992); <u>Cohen v. Lupo</u>, 927 F.2d 363, 365 (8th Cir. 1991); <u>Rogers v. Furlow</u>, 729 F. Supp. 657, 659 (D. Minn. 1989); <u>State v. Decker</u>, 138 N.H. 432, 438 (1994).

[4] The claim of malicious defense recognized in <u>Aranson v. Schroeder</u>, 140 N.H. 359 (1995) imposes liability on an attorney or law firm not for negligence (requiring a duty) but for intentionally pleading defenses that the party knows are meritless primarily for an improper purpose. <u>Id.</u> at 367.

10

intended beneficiary of a client's will, notwithstanding the lack of privity between attorney and beneficiary, based on the relationship that arises in that context and the obvious and apparent risk of foreseeable injury to the intended beneficiary of the legal services provided. Simpson, 139 N.H. at 5-6. When an attorney drafts a will for a client who instructs counsel that she intends to benefit a third party, the lawyer "'in fact assumes a relationship not only with the client but also with the client's intended beneficiaries.'" Id. at 5 (quoting Heyer v. Flaig, 449 P.2d 161, 164-65 (Cal. 1969)). Thus, an attorney's negligence liability to a third party, to the extent it has been recognized in New Hampshire, depends upon an assumed duty to that third party.

In contrast, an attorney drafting pleadings on behalf of a client does not assume a relationship with, or duty to, people mentioned in the pleadings. Plaintiff has not demonstrated any other basis upon which the defendant attorneys or law firms can be said to have entered into a relationship with, or assumed a duty to him. Absent some relationship between a defendant attorney (or law firm) and a third party, no duty may be imposed on the attorney to foresee and avoid harm to that third party. See, e.g., Simpson, 139 N.H. at 5-6. Plaintiff has failed to state claims for legal malpractice maintainable under New Hampshire law, and those claims are dismissed.

## C.    <u>Enhanced Compensatory Damages</u>

Hugel brings a separate claim for enhanced compensatory damages.  Under New Hampshire law, compensatory damages may be enhanced in tort actions for "wanton, malicious, or oppressive" conduct.  <u>Vratsenes v. N.H. Auto, Inc.</u>, 112 N.H. 71, 73 (1972). Since all of Hugel's tort claims are dismissed, there remains no claim on which he might be awarded enhanced compensatory damages.

## D.    <u>Personal Jurisdiction</u>

Since all of Hugel's claims against all defendants are dismissed, it is not necessary to consider the issue of personal jurisdiction raised in defendants' motion to dismiss.

## CONCLUSION

For the foregoing reasons, the court grants defendants' motion to dismiss (document no. 7); denies as moot defendant GB&C's motion to dismiss for lack of personal jurisdiction (document no. 8); denies plaintiff's motion to certify questions of law to the New Hampshire Supreme Court (document no. 19); denies plaintiff's motion for extension of time to file a further response to defendant's motion to dismiss (document no. 11); and denies as moot plaintiff's motion to compel (document no. 23). The clerk shall enter judgment in favor of the defendants and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

March 24, 1998

cc:   Andrew D. Dunn, Esq.
      Pamela E. Phelan, Esq.
      Jeffrey L. Alitz, Esq.