MICHAEL W. BRUZGA, ADMINISTRATOR OF THE ESTATE
OF RICHARD C. BRUZGA

v.

PMR ARCHITECTS, P.C. N/F/K/A PAGE/MICHAELIS ASSOCIATES
& a.

April 21, 1997

*McDowell & Mekeel, PA,* of Manchester (*Richard J. Walsh* and *Mark D. Morrissette* on the brief, and *Mr. Walsh* orally), for the plaintiff.

*Burns & Levinson,* of Boston, Massachusetts (*David J. Hatem & a.* on the brief, and *Jeffrey L. Alitz* orally), for defendant PMR Architects, P.C. n/f/k/a Page/Michaelis Associates.

*Law Office of Robert L. Hermann, Jr.,* of Manchester (*Mary Anne Mueller* on the brief, and *David Woodbury* orally), for defendant Capitol Fire Protection Co., Inc.

THAYER, J. The plaintiff, Michael W. Bruzga, administrator of the estate of Richard C. Bruzga, appeals an order of the Superior Court (*McGuire,* J.) granting the defendants' motions to dismiss. According to the trial court, the plaintiff failed to allege facts sufficient to show that the defendants fall within a recognized exception to the general rule of nonliability for the suicide of another. We affirm.

The plaintiff alleged the following facts. The decedent, Richard C. Bruzga, was an inmate in the Secure Psychiatric Unit located at the New Hampshire State Prison. Defendant PMR Architects, P.C. n/f/k/a Page/Michaelis Associates (PMR), was responsible for designing the Secure Psychiatric Unit and for supervising its construction. Capitol Fire, Inc. (Capitol Fire) installed the unit's sprinkler system.

On March 14, 1990, the decedent committed suicide by hanging himself with shoelaces he had attached to the sprinkler nozzle in his cell. The plaintiff alleged that the defendants were fully aware that they were designing and constructing the Secure Psychiatric Unit for mentally disturbed individuals who might attempt to harm themselves or others. The plaintiff sought damages under negligence and strict liability theories.

"On an appeal from an order granting a motion to dismiss, the only issue raised is whether the allegations are reasonably susceptible of a construction that would permit recovery." *Collectramatic, Inc. v. Kentucky Fried Chicken Corp.,* 127 N.H. 318, 320, 499 A.2d 999, 1000 (1985) (quotation omitted). When ruling upon a motion to dismiss, "we assume the truth of the plaintiff's allegations of fact and construe all reasonable inferences therefrom in the light most favorable to the plaintiff." *Williams v. O'Brien,* 140 N.H. 595, 600, 669 A.2d 810, 813 (1995).

*I. Negligence*

■ "As a general rule, negligence actions seeking damages for the suicide of another will not lie because the act of suicide is considered a deliberate, intentional and intervening act which precludes a finding that a given defendant, in fact, is responsible for the harm." *McLaughlin v. Sullivan,* 123 N.H. 335, 337, 461 A.2d 123, 124 (1983). This is because the act of suicide "breaks the causal

connection between the wrongful or negligent act and the death." *Mayer v. Town of Hampton*, 127 N.H. 81, 84, 497 A.2d 1206, 1209 (1985). A number of jurisdictions, however, have delineated two exceptions to the general rule. *Id.*

"The first exception recognizes a cause of action where the defendant actually causes the suicide." *Murdock v. City of Keene*, 137 N.H. 70, 72, 623 A.2d 755, 756 (1993). We adopted the first exception in *Mayer*, 127 N.H. at 87, 497 A.2d at 1210-11. A defendant may be found liable "where the conduct of the defendant was an intentional tort and extreme and outrageous, and where this conduct caused severe emotional distress on the part of the victim which was a substantial factor in bringing about the victim's ensuing suicide." *Id.* at 88, 497 A.2d at 1211. This exception does not apply in this case.

The second exception recognizes a cause of action where the defendant has "a specific duty of care to prevent suicide," arising from the defendant's "special relationship with the suicidal individual." *McLaughlin*, 123 N.H. at 338, 461 A.2d at 125; *see Murdock*, 137 N.H. at 73, 623 A.2d at 756. In *McLaughlin*, we stated:

> [T]his duty has been imposed on: (1) institutions such as jails, hospitals and reform schools, having actual physical custody of and control over persons; and (2) persons or institutions such as mental hospitals, psychiatrists and other mental-health trained professionals, deemed to have a special training and expertise enabling them to detect mental illness and/or the potential for suicide, and which have the power or control necessary to prevent that suicide.

*McLaughlin*, 123 N.H. at 338, 461 A.2d at 125 (citations omitted). Even if we were to adopt the second exception, we hold that the defendants did not have the requisite special relationship with the decedent to create a specific duty of care to prevent his suicide.

■ Fundamental to the second exception is a pre-existing duty of care and protection imposed on defendants either because they have "actual physical custody of, and substantial or total control over, an individual," *id.* at 340, 461 A.2d at 126, or because the defendants are "specially trained medical or mental health professional[s], who ha[ve] the precise duty and the control necessary to care for the physical and/or mental well-being of a patient," *id.* In this case, neither PMR nor Capitol Fire had actual physical custody of the decedent. They did not have substantial or total control over the decedent. They did not have special medical or mental health care training. PMR and Capitol Fire were in the business of

designing and constructing buildings, not providing mental health care for suicidal individuals. *See generally Tittle v. Giattina, Fisher & Co.*, 597 So. 2d 679, 681 (Ala. 1992). Thus, neither PMR nor Capitol Fire is similar to the typical defendants who have been found liable under the second exception. *See McLaughlin*, 123 N.H. at 338, 461 A.2d at 125.

■ We refuse to extend suicide liability to architects, contractors, engineers, and a vast array of other parties involved with the design and construction of buildings. We are familiar with only one jurisdiction in which a court has held a building contractor liable for the suicide of another. *See Honey v. Barnes Hosp.*, 708 S.W.2d 686, 700 (Mo. Ct. App. 1986). Most jurisdictions are reluctant to impose liability for suicide even upon defendants who had custodial control over the suicidal individual. *See Pretty On Top v. City of Hardin*, 597 P.2d 58 (Mont. 1979); *City of Belen v. Harrell*, 603 P.2d 711 (N.M. 1979); *Johnson v. Grant Hospital*, 291 N.E.2d 440 (Ohio 1972); Note, *Custodial Suicide Cases: An Analytical Approach to Determine Liability For Wrongful Death*, 62 B.U. L. REV. 177, 177-78 (1982).

While we recognize that architects and contractors have a duty to design and construct safe structures, *see La Bombarbe v. Phillips Swager Assoc.*, 474 N.E.2d 942, 945 (Ill. Ct. App. 1985), this duty is not limitless. Architects and contractors should not be exposed to endless suicide liability when they have relinquished their authority and control over the facility to the owner. *See Easterday v. Masiello*, 518 So. 2d 260, 261-62 (Fla. 1988) (architects and engineers of jail containing patent defect, on which inmate committed suicide by hanging, were relieved of liability after control turned over to jail owner). Additionally, architects and contractors do not have a duty to make prison cells suicide-proof. *See Tittle*, 597 So. 2d at 681.

Even for intentional torts under the first exception, the tortfeasor's conduct must be *extreme and outrageous* in order to support a cause of action. *Mayer*, 127 N.H. at 87, 497 A.2d at 1211. It would be inconsistent to now permit a cause of action for mere negligence when the defendants' conduct was no more than a *failure to prevent* suicide, absent a special relationship with the decedent. *Murdock*, 137 N.H. at 73, 623 A.2d at 756. The special relationship exception is a narrow circumstance available only if the primary purpose of the institution or medical professional is to care for the individual suffering from mental illness. *See McLaughlin*, 123 N.H. at 338, 461 A.2d at 125. We must take care not to equate special relationship with any relationship. Permitting ordinary negligence claims for suicide would lead to inconsistencies in our suicide tort law.

Extending liability in this case would also transform our general rule of nonliability for the suicide of another into the exception. As we noted in *Libbey v. Hampton Water Works Co.*, 118 N.H. 500, 389 A.2d 434 (1978), "duty . . . is an exceedingly artificial concept. If a court wishes to impose liability, it can easily find the necessary 'relationship' between the parties to create the duty," *id.* Imposing liability in the instant case would encourage a proliferation of attenuated claims in suicide litigation and discourage firms from contracting with the State to design and construct mental health related facilities. *See McLaughlin*, 123 N.H. at 342, 461 A.2d at 127.

Our holding today acknowledges the difficulty in preventing suicide. *See Broussard v. State Through Div. of Hosp.*, 356 So. 2d 94, 96 (La. Ct. App.), *writ denied*, 358 So. 2d 639 (La. 1978); *Tittle*, 597 So. 2d at 681; *La Bombarbe*, 474 N.E.2d at 945. As the court explained in *Tittle*, there are countless ways that inmates and patients commit suicide, including, "cutting wrists or other body parts, drowning, electrocution, swallowing a razor blade, and a stab to the stomach." 597 So. 2d at 681. The *Tittle* court rejected a negligence claim against an architectural firm for the suicide of an inmate in a county jail it designed, stating, "it cannot be said in this case that the architect's design was 'closely connected' to the suicide." *Id.* At most, the architect's design merely "allowed one form of suicide to be committed rather than another." *Id.*

In *La Bombarbe*, the court also refused to recognize a claim against an architect for suicide, stating that "the precautionary tools used to prevent suicide are *insufficient* and often times are designed for the convenience of jail personnel and not for the benefit of the inmate." *La Bombarde*, 474 N.E.2d at 945. "Not hospitalization, one-to-one surveillance, seclusion, or physical restraints will prevent suicide if the patient is determined to commit it." Schwartz *et al.*, *Suicide in the Psychiatric Hospital*, 132 AM. J. PSYCH. 150, 150 (1975). "Even in the case of individual psychiatrists, commentators have suggested that imposing liability . . . is only appropriate if [the] patient is hospitalized at the time of the suicide, because a psychiatrist does not have *sufficient control* over the non-hospitalized patient to prevent his suicide." *McLaughlin*, 123 N.H. at 340, 461 A.2d at 126 (quotations omitted). In this case, once the defendants completed their work, any authority or control they may have had terminated. Although their authority terminated, the plaintiff would, nonetheless, extend the defendants' liability indefinitely to all future inmates housed in the facility. We refuse to so hold.

## II. Strict Liability

The plaintiff next argues that he has stated a claim based on a theory of strict liability on the grounds that the condition of the sprinkler system in the decedent's cell was unreasonably dangerous. "Legal liability is said to be strict when it is imposed even though the defendant has committed no legal fault consisting of the violation of a common law or statutory duty." *Bagley v. Controlled Environment Corp.*, 127 N.H. 556, 558, 503 A.2d 823, 825 (1986). "[S]trict liability for damages has traditionally met with disfavor in this jurisdiction." *Id.* at 559, 503 A.2d at 825; *see Siciliano v. Capitol City Shows, Inc.*, 124 N.H. 719, 730, 475 A.2d 19, 25 (1984) (declining to extend a strict liability cause of action to purchasers of services); *Moulton v. Groveton Papers Co.*, 112 N.H. 50, 53-54, 289 A.2d 68, 71 (1972) (rejecting tort standard of strict liability for ultrahazardous activity). In New Hampshire, "strict liability is available only where the Legislature has provided for it or in those situations where the common law of this state has imposed such liability and the Legislature has not seen fit to change it." *Anglin v. Kleeman*, 140 N.H. 257, 261, 665 A.2d 747, 751 (1995) (quotation and brackets omitted). Here, the plaintiff fails to direct us to any legislative authority or common law that would support a strict liability cause of action against an architect or contractor.

Nonetheless, the plaintiff argues that we should include architects and contractors within the general category of manufacturers, and thereby impose strict liability when they provide a defective product. *See Thibault v. Sears, Roebuck & Co.*, 118 N.H. 802, 806-07, 395 A.2d 843, 846 (1978); *LeBlanc v. American Honda Motor Co., Inc.*, 141 N.H. 579, 586, 668 A.2d 556, 562 (1997). We disagree.

In *Sime v. Tvenge Associates Architects*, 488 N.W.2d 606 (N.D. 1992), the court observed:

> The reasons for the development of strict liability in tort were the lack of privity between the manufacturer and the buyer, the difficulty of proving negligence against a distant manufacturer using mass production techniques, and the better ability of the mass manufacturer to spread the economic risks among its consumers. These considerations are not applicable in a contract for professional services.

*Id.* at 611 (quotations, brackets, and ellipses omitted).

Unlike a consumer who purchases a mass-produced good, we fail to see how the owner or user of a building faces extraordinary difficulties in proving liability under traditional negligence principles. *Id.* "[I]t is easier to trace a defect to a builder than to a

manufacturer as there is more opportunity to make a meaningful inspection of a structure on real property." *Wright v. Creative Corporation*, 498 P.2d 1179, 1182-83 (Colo. Ct. App. 1972). As the court explained in *Bagley*, "[w]e . . . decline to impose strict liability in the absence of any demonstration that the requirement to prove legal fault acts as a practical barrier to otherwise meritorious claims." *Bagley*, 127 N.H. at 560, 503 A.2d at 826.

■ Furthermore, we are not convinced that architects and contractors are able to spread their economic losses as easily as manufacturers are able to spread their losses to the consumers of their mass-produced goods. *Sime*, 488 N.W.2d at 611. While manufacturers "have ample opportunity to test their products for defects before marketing them, the same cannot be said of architects. Normally, an architect has but a single chance to create a design for a client which will produce a defect-free structure." *City of Mounds View v. Walijarvi*, 263 N.W.2d 420, 425 (Minn. 1978).

Architects and building contractors are not in the business of "mass production and distribution of goods to a large body of distant consumers." *Bd. of Trustees, Etc. v. Kennerly, Etc.*, 400 A.2d 850, 854 (N.J. Super. Ct. Law Div. 1979); *see La Rossa v. Scientific Design Company*, 402 F.2d 937, 941-42 (3d Cir. 1968). Simply stated, "the raising of a building and the assembly-line manufacturing of a product are not analogous processes." Comment, *Strict Liability and the Building Industry*, 33 EMORY L.J. 175, 186 (1984); *see also Easterday*, 518 So. 2d at 261 (strict liability inapplicable to "structural improvements to real estate"). *But cf. Schipper v. Levitt & Sons, Inc.*, 207 A.2d 314, 325-27 (N.J. 1965) (strict liability principles applied to manufactured housing under limited circumstances). We view architects and contractors as providing a professional service. Although a building contractor supplies a structure to the owner,

> [t]he generally accepted view has not been to impose strict liability, either on a warranty or tort theory, to the building contractor who is regarded as being engaged primarily in the rendition of a service, i.e., the construction of a building on land owned by another pursuant to plans and specifications provided by the owner.

W. KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 104A, at 724 (5th ed. 1984). Accordingly, we affirm the court's ruling in favor of the defendants.

*Affirmed.*

BRODERICK, J., with whom HORTON, J., joined, concurred in part and dissented in part; the others concurred.

BRODERICK, J., concurring in part and dissenting in part: While I agree with the result reached by the majority in part II of its opinion, I believe that the defendants undertook a duty to the plaintiff's decedent which exposed them to liability upon breach. Accordingly, I respectfully dissent from part I of the majority opinion.

Our prior cases on suicide liability, as the majority correctly notes, recognize that suicide is an act which generally breaks the causal chain flowing from a defendant's negligence. *See Mayer v. Town of Hampton*, 127 N.H. 81, 84, 497 A.2d 1206, 1209 (1985). We have, however, also adopted two exceptions to the general rule.

First, a cause of action exists "where the defendant actually causes the suicide." *Murdock v. City of Keene*, 137 N.H. 70, 72, 623 A.2d 755, 756 (1993). While the phrasing of this exception does suggest some circularity, the exception primarily reflects the traditional rule that "it is better for unexpected losses to fall upon the intentional wrongdoer than upon the innocent victim." *Mayer*, 127 N.H. at 85, 497 A.2d at 1210 (quotation omitted). Therefore, one who, for example, intentionally inflicts extreme emotional distress that results in a suicide may be held liable under this exception. *See id.* at 87, 497 A.2d at 1210-11.

The second exception applies when "the defendant has a duty to prevent the suicide." *Murdock*, 137 N.H. at 72, 623 A.2d at 756. Such a duty may "arise as a matter of law from a special relationship between the defendant and the suicidal individual." *Id.* We have explained that "the *typical* defendant in such a case is someone who has a duty of custodial care, is in a position to know about suicide potential, and fails to take measures to prevent suicide from occurring." *Id.* (emphasis added) (quotation omitted).

Our description of the *typical* defendant is not an encyclopedic register of all those who may be liable under the duty exception. Nonetheless, the majority's opinion converts what prior opinions intended as an illustration into an exhaustive list, and suggests that absent a custodial relationship liability cannot arise. In doing so, the majority transforms a compelling rule into a slim exception that covers only wardens and jailers, thus shielding all other conceivable

defendants from liability despite their voluntary assumption of a duty to prevent the suicide. Such an extension of immunity ignores this court's tradition of allowing recovery for wrongful conduct that causes harm, and suggests that a defendant can flagrantly disregard the safety of a known suicidal individual. Further, the majority's holding insulates architects and contractors from liability despite our long-standing "refusal to protect particular classes of defendants." *Spherex, Inc. v. Alexander Grant & Co.*, 122 N.H. 898, 904, 451 A.2d 1308, 1312 (1982). This approach is particularly inappropriate in this case, as there is a complete absence of the type of weighty concerns that would warrant such protection.

In the present case, which comes to this court following the trial court's grant of motions to dismiss, we must assume the facts alleged by the plaintiff to be true and, similarly, construe all reasonable inferences therefrom in the light most favorable to the plaintiff. *See Gardner v. City of Concord*, 137 N.H. 253, 255-56, 624 A.2d 1337, 1338 (1993). If the factual allegations constitute a basis for legal relief, we *must* hold that it was improper for the trial court to grant the motions. *Id.* at 256, 624 A.2d at 1338.

Accordingly, we must assume that the defendants were aware of the heightened precautions that were necessary in the planning, designing, and construction of this secured psychiatric facility and that the defendants knew that a key factor in their work was the prevention of suicide. In short, we must assume that the defendants knowingly undertook to design and construct a cell that would thwart suicide attempts. Such facts are indicative of the kind of duty to anticipate and prevent suicide that warrants inclusion within the second exception that we have recognized in our prior cases. *See Murdock*, 137 N.H. at 72-73, 623 A.2d at 756-57; *cf. Sneider v. Hyatt Corporation*, 390 F. Supp. 976, 981 (N.D. Ga. 1975) (refusing to dismiss case when hotel allegedly knew upper floors had previously been used for suicide).

The defendants suggest that no duty exists because they never came into direct contact with the decedent. This argument overlooks several cases in which we have held "that a defendant may be liable to third parties for a foreseeable harm resulting from the breach of a duty of care." *Williams v. O'Brien*, 140 N.H. 595, 599-600, 669 A.2d 810, 813 (1995) (collecting cases). Moreover, some fifteen years ago this court noted that "we have expressed our disfavor for the privity doctrine in personal injury cases." *Spherex, Inc.*, 122 N.H. at 903, 451 A.2d at 1311. Indeed, the logic of these cases reveals the extent to which the majority's holding departs from established principles of New Hampshire tort law, as we have consistently allowed cases to

proceed to trial when the defendant has contracted with another for the benefit of a faceless, yet anticipated, third party, and harm has come to that third party as a result of the defendant's failure to fulfill its responsibilities. *See, e.g., Simpson v. Calivas,* 139 N.H. 1, 5-6, 650 A.2d 318, 321-22 (1994).

The majority extensively details all of the obstacles to prevention of suicide and suggests that this difficulty demonstrates the folly of potentially subjecting the present defendants to liability. The factors that the majority relies upon, however, relate to the difficulty of *supervising* suicidal patients, and have no bearing in a case where the defendant's negligence afforded the means that an individual used to commit suicide. *See Knight v. Wal-Mart Stores, Inc.,* 889 F. Supp. 1532, 1542 (S.D. Ga. 1995); *see also Tittle v. Jefferson County Com'n,* 10 F.3d 1535, 1543-44 (11th. Cir. 1994) (en banc) (Kravitch, J., concurring). A defendant that "has created a condition which involves an unreasonable risk of harm to another has a duty to exercise reasonable care to prevent the risk from taking effect." *Walls v. Oxford Management Co.,* 137 N.H. 653, 658, 633 A.2d 103, 106 (1993).

The majority's reliance on the Alabama Supreme Court's decision in *Tittle* is unpersuasive, as it suggests that, because suicide is an allegedly inevitable occurrence, a professional's carelessness may be excused when it *merely* "allowed one form of suicide to be committed rather than another." *Tittle v. Giattina, Fisher & Co.,* 597 So. 2d 679, 681 (Ala. 1992). This notion is inconsistent with basic principles of tort law, as "[d]iscouragement of wrong . . . should not go so far as to lead to the promotion of harmful or indifferent conduct," *Dillon v. Company,* 85 N.H. 449, 453, 163 A. 111, 113 (1932), and raises the distressing possibility that the builders of mental health facilities will have little incentive to respect the rights of the intended users of these facilities.

At heart, the majority's holding apparently rests upon a fear that "[i]mposing liability in the instant case would . . . discourage firms from contracting with the State to design and construct mental health related facilities." This anxiety ignores the ability of builders or architects to either incorporate the risk of liability into their pricing structure, or purchase insurance against such costs. Moreover, allowing this case to proceed would not impose liability on builders or architects generally; typically, these parties do not undertake a duty to prevent suicide, and unforeseeable suicide remains an intervening cause that breaks the causal chain. This is true even when the architect or builder is involved with the construction of an ordinary jail or prison. *See Tittle,* 597 So. 2d at

681. The current case, however, is unique. The defendants knowingly undertook a project that entailed the building of certain cells that were intended from their inception to hold psychiatric patients, and were expressly designed to prevent self-inflicted harm. The State and, in turn, the decedent, relied upon the special design and construction skills the defendants were thought to possess to protect against the very harm that has come to pass. In such a circumstance, the defendants may be held legally responsible for the consequences of the defective nature of the building, as they had the knowledge and the ability to foresee and prevent the harm. *See Honey v. Barnes Hosp.*, 708 S.W.2d 686, 699 (Mo. Ct. App. 1986); *cf. Jefferson County Com'n*, 10 F.3d at 1543-44 (Kravitch, J., concurring); *De Sanchez v. Genoves-Andrews*, 446 N.W.2d 538, 541 (Mich. Ct. App. 1989); *Szostak v. State*, 247 N.Y.S.2d 770, 771 (App. Div. 1964); *O'Brien v. State*, 33 N.Y.S.2d 214, 216-17 (Ct. Cl. 1942).

HORTON, J., joins in the opinion of BRODERICK, J.