NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports.  Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by email at the following address: reporter@courts.state.nh.us.  Opinions are available on the Internet by 9:00 a.m. on the morning of their release.  The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Compensation Appeals Board
No. 2019-0605

APPEAL OF PELMAC INDUSTRIES, INC.
(New Hampshire Compensation Appeals Board)

Argued: November 19, 2020
Opinion Issued: October 13, 2021

Bernard & Merrill, PLLC, of Manchester (Gary S. Harding on the brief and orally), for the petitioner.

Moquin & Daley, P.A., of Manchester (Terrence J. Daley on the brief and orally), for the respondent.

HANTZ MARCONI, J.  The petitioner, AmGUARD Insurance Group (Carrier), insurer of Pelmac Industries, Inc. (Pelmac), appeals a decision of the New Hampshire Compensation Appeals Board (CAB) awarding workers' compensation death benefits to the respondent, the decedent-employee's estate.  See RSA 281-A:26 (2010); see also RSA 281-A:2, XI (Supp. 2020).  The Carrier argues that the decedent's original June 5, 2018 injury was not a work-related injury, and, in the alternative, that his subsequent death by suicide did not result from the original injury.  The Carrier also argues that the CAB violated its due process rights.  We affirm.

I

The following facts were found by the CAB or are supported by the record before it.  The decedent lived with his wife in Manchester and worked as an

alarm installer and technician for Pelmac, an alarm system company.  Pelmac's office is located in Manchester, but the decedent did not usually commute to and from the office location.  Instead, the decedent traveled to various work sites throughout New Hampshire and Massachusetts using a company van, which he usually drove directly between his home and work sites.  Although he worked a regular schedule of four, 10-hour days, he was also always on call and would be sent to problem situations before or after hours.

On June 4 and 5, 2018, the decedent had an assignment at a work site in the Berlin area, about a two-and-a-half-hour drive from Manchester.  After the first day of work in Berlin, he drove the company van to his home as usual and he drove back to Berlin the next morning for the second day of the assignment.  While driving home on June 5, at approximately 4:45 p.m., the decedent was involved in a single-vehicle accident when the company van crossed the road, went into the median, and flipped over.[1]  According to the CAB, "[t]here was no explanation of why the van left the road, although there was a thought that perhaps [the decedent] fell asleep."  As a result of the accident, the decedent sustained serious injuries, including multiple lacerations to his head, a fractured neck, a concussion, a serious tear to his left rotator cuff, and multiple fractured ribs.  He was taken to the hospital for emergency care, where he remained for five days.  One of the decedent's physicians, a neurologist, noted that the "accident might have been related to" the decedent's sleep apnea, which was being managed and treated with a "CPAP" machine.  The neurologist reported that the decedent had not used his CPAP machine on the two nights before the accident because it was due for a cleaning, but that he "obtained about five to seven hours of sleep for the two days prior to the accident" and "did not note drowsiness" the day of the accident.

The decedent's rotator cuff injury required surgery on his shoulder that could not be performed until his neck fracture healed and his neck brace, which he needed to wear at virtually all times, could be safely removed.  The CAB found that the decedent "desperately wanted the rotator cuff surgery" and the decedent's widow testified that he was "very anxious and worried" about the fact that "the longer it takes to do the surgery . . . , the less likely [it was that he would be] able to get full range of motion back."  According to the CAB, the evidence established that the decedent could not "drive a car or fully care for himself," nor could he "get back to work and be the person he once was," while he waited for his neck fracture to heal.  Usually a "cheerful, busy and active person," he became "increasingly inactive," "emotional, often crying, and morose."

---

[1] The CAB noted that "[t]here was no testimony as to where in Manchester [the decedent] was heading" on the day of the accident.  Our review of the record reveals, and it is undisputed on appeal, that the decedent was traveling home when he was involved in the June 5, 2018 motor-vehicle accident.  We proceed with that understanding.

2

His wife observed her husband's increasing anxiety about his injuries, explaining that "[h]e wasn't used to being sedentary" and he was concerned that "if this didn't get fixed like [the doctors] said in a timely fashion that he wasn't going to have his quality of life that he knew prior to the accident." He had begun keeping a diary after the accident in which he documented his dissatisfaction with his doctors, his efforts to expedite and understand his recovery, his panic about his injuries not healing, and his acute fear of not being able to regain his pre-accident quality of life. The CAB found that the decedent's family "knew that things were getting worse over the course of the summer," but they did not fully recognize "[t]he extent of his depression-like mental state."

For more than two months the decedent lived with and tried to manage his injuries, including wearing his neck brace almost "24/7." On August 29, he met with a neurosurgeon, expecting to hear that the neck brace could be removed and to have his shoulder surgery scheduled. However, the decedent was informed that his neck fracture required at least another month to properly heal and at that time the neurosurgeon would re-evaluate whether the decedent's shoulder surgery could be scheduled. The CAB further found: "This news was devastating to [the decedent] and apparently was the last straw."

Four days after meeting with the neurosurgeon, on September 2, the decedent died by suicide at his home. When his family discovered him, they found a suicide note in a plastic bag in his pocket, "thanking his wife and expressing deep dissatisfaction with his present and future situation."

The Carrier had initially accepted and paid the decedent's workers' compensation claim that he filed as a result of the motor-vehicle accident. After his suicide, however, the Carrier terminated payment of the claim, explaining that the decedent's death was "not causally related to the work injury and did not arise out of or in the course of employment." Consequently, the respondent sought review by the New Hampshire Department of Labor (DOL) to obtain workers' compensation death benefits. See RSA 281-A:26. Following a hearing, the DOL hearing officer found that the decedent's June 5 injury arose out of and in the course of employment but that the suicide was not causally related to the June 5 work injury which foreclosed death benefits under RSA 281-A:26. See RSA 281-A:43, I(a) (2010). Both parties appealed the hearing officer's decision to the CAB. See RSA 281-A:43, I(b) (2010).[2]

The evidence before the CAB included the decedent's medical records, the accident report, and testimony of the decedent's widow, his two children,

---

[2] See also RSA 281-A:41 (2010) ("No payment of any benefits under this chapter shall in any way prejudice the rights of an employer in any dispute regarding the question of whether or not an injury or occupational disease arose out of and in the course of an employee's service.").

and a friend. Also, as specifically pertaining to the issue of the decedent's death by suicide, the CAB had before it the medical reports and opinions of two doctors — Dr. William J. Jamieson, a licensed psychologist and expert for the respondent, and Dr. Albert M. Drukteinis, a licensed psychiatrist and expert for the Carrier.

On the issue of whether the decedent's injuries suffered as a result of the June 5 single-vehicle accident constituted a work-related injury, the CAB determined that the respondent met its burden of proving "the causal relationship of the injury to employment." It reasoned that the decedent traveled extensively for his job, which involved "traveling long distances, working on site, and returning to Manchester," including "in the instant case." The CAB found, "[a]s far as the 'going and coming rule,' . . . his daily work started when he left his house in the company van." Additionally, it found that, "[p]ursuant to Appeal of Margeson," 162 N.H. 273 (2011), "the risk involved [in the June 5 accident] is directly associated with employment," and the decedent's travel "would be an included risk of his employment."

With regard to the death by suicide, the CAB determined that "there was an obvious cause and effect between the [June 5] work accident and injuries . . . and the suicide," and that the decedent's widow was entitled to death benefits. In arriving at this conclusion, the CAB noted an obvious difference between the medical opinions of Jamieson and Drukteinis. Jamieson's opinion, as evidenced in two reports submitted to the CAB, was based upon his interview with the decedent's widow and his review of the decedent's medical records, the suicide note, and the accident report. He explained that "[t]here is nothing in [the decedent's] past history to suggest previous vulnerability to depression, despair, or suicidal ideation, or, in fact, to suggest any significant prior psychiatric issues." However, from the available medical records, he concluded that the decedent "did sustain a traumatic brain injury in brain areas involved with emotion control, reasoning, and judgment, as well as other physical injuries significantly affecting his functional capacity," and noted the "significant body of literature indicating a notably increased risk of suicidal ideation after traumatic brain injury." In Jamieson's opinion, "the combination of injuries from [the decedent's June 5 accident] comprise the precipitating cause of his suicide."

Drukteinis's opinion was based upon his review of the decedent's medical records, his diary and suicide note, the accident report, and Jamieson's prior report. The CAB noted that Drukteinis found that the records "do not fully explain why" the decedent committed suicide. He opined that "[t]he motivation to commit suicide may have stemmed from injuries sustained in the motor-vehicle accident [on June 5], but [the decedent] was not compelled because of those injuries to do so and nothing in the records establishes that it was not his willful choice." In response to Drukteinis's report, Jamieson agreed that the records did not "fully explain the suicide"; nevertheless, he opined that, "[i]f

4

not for the [June 5] accident and its documented consequences, . . . it is extremely unlikely" that the suicide would have occurred. From this perspective, he concluded that "the accident and injuries were causal."

The CAB credited Jamieson's opinion, which it described as concluding that the June 5 injury "was a substantial proximate cause of the September 2, 2018 suicide," finding it to be "more persuasive and logical." In weighing the two experts' opinions, the CAB noted that Jamieson "had the benefit of interviewing" the decedent's widow, whereas Drukteinis had not. The CAB reasoned that the widow was able to provide further details on how her husband's "spirits had deteriorated," which "undoubtedly gave [Jamieson] additional insight." The CAB also found Jamieson's opinion "made more sense" in light of the "obvious cause and effect" between the June 5 injury which resulted in the decedent's "increasing despair" and his suicide. Additionally, although the CAB acknowledged that compensation is precluded for an "injury proximately caused by the employee's willful intention to injure himself," RSA 281-A:2, XI, it found that the suicide "was not a rational act based upon [the decedent's] deteriorating mental health and the gruesome manner" of his death by suicide.

The CAB ultimately found that the respondent met its burden to prove that it was entitled to death benefits by a preponderance of the evidence, adding that it did "not make sense to preclude recovery of widow's benefits in this situation." The Carrier moved for reconsideration and a rehearing, to which the respondent objected. The CAB denied the Carrier's motion, and this appeal followed.

II

As the appealing party, the Carrier has the burden of demonstrating that the CAB's decision was made in error. See Appeal of LeBorgne, 173 N.H. 488, 493 (2020). We will not disturb the CAB's decision absent an error of law or, unless, by a clear preponderance of the evidence, we find it to be unjust or unreasonable. Id.; see RSA 541:13 (2021). All findings of the CAB upon questions of fact properly before it are deemed to be prima facie lawful and reasonable. Appeal of LeBorgne, 173 N.H. at 493; see RSA 541:13. Thus, we review the CAB's factual findings deferentially. Appeal of LeBorgne, 173 N.H. at 493. "[O]ur task is not to determine whether we would have found differently than did the [CAB], or to reweigh the evidence, but rather to determine whether the findings are supported by competent evidence in the record." Appeal of Dean Foods, 158 N.H. 467, 474 (2009) (quotation omitted). The CAB's findings of fact will not be disturbed if they are supported by competent evidence in the record, upon which the CAB's decision reasonably could have been made. Id. When faced with conflicting expert testimony, factfinders are free to disregard or accept, in whole or in part, that testimony. Id.

5

III

On appeal, the Carrier argues that the CAB erred in finding that the decedent's June 5 injury was work-related. Under New Hampshire's Workers' Compensation Law, an injury is compensable if it "aris[es] out of and in the course of employment" — if the injury is work-related. RSA 281-A:2, XI. We construe the statute liberally, resolving all reasonable doubts in statutory construction in favor of the injured employee in order to give the broadest reasonable effect to the remedial purpose of New Hampshire's Workers' Compensation Law. Appeal of Griffin, 140 N.H. 650, 654 (1996).

Because the decedent was traveling home at the time of the accident, the Carrier argues that his June 5 injury was not work-related. Citing Donnelly v. Kearsarge Telephone Co., 121 N.H. 237, 240 (1981), the Carrier maintains that the "going and coming" rule "forecloses the Claimant's right to workers' compensation benefits" because "[t]raveling home is not an activity related to employment," and that there is no "portal-to-portal" coverage for on-call employees in New Hampshire, such as the decedent.

We disagree with the Carrier's contentions. In Donnelly, we explained that, under the "going and coming" rule, "the ordinary perils of travel between home and the workplace are not risks of the employment and injuries arising therefrom are not ordinarily compensable." Donnelly, 121 N.H. at 240. However, the Carrier's argument ignores the development of our case law since Donnelly, which recognizes that "the [operative] question is not what the employee is about to do, or has just been doing, but whether or not at the time of injury he is within the 'zone[, i.e., the scope,] of his employment.'" Whittemore v. Sullivan Cty. Homemaker's Aid Serv., 129 N.H. 432, 436 (1987) (brackets and quotation omitted). Demonstrating that peripheral or ancillary activities were within the scope of employment required the respondent to prove the prongs of the Murphy test:

> (1) that the injury arose out of employment by demonstrating that it resulted from a risk created by the employment; and (2) that the injury arose in the course of employment by demonstrating that (A) it occurred within the boundaries of time and space created by the terms of employment; and (B) it occurred in the performance of an activity related to employment, which may include a personal activity if reasonably expected and not forbidden, or an activity of mutual benefit to employer and employee.

Murphy v. Town of Atkinson, 128 N.H. 641, 645-46 (1986) (citations omitted).

We have also recognized that when "the employment requires travel, the employee is consequently exposed to hazards he or she would otherwise have

6

the option of avoiding. Thus the hazards of the route become the hazards of the employment." Appeal of Griffin, 140 N.H. at 655 (brackets and quotation omitted); see, e.g., Whittemore, 129 N.H. at 436 (concluding icy streets, walkways, and driveways were "hazards of [the claimant's] employment" because travel was "itself a substantial part of the service for which the plaintiff [was] employed"). A traveling employee, one whose "employment requires travel," for example, "is generally considered to be within the scope of his employment throughout his sojourn." Appeal of Griffin, 140 N.H. at 655 (citing Boyce v. Potter, 642 A.2d 1342, 1344 (Me. 1994)). As the Maine Supreme Judicial Court has explained, "Traveling employees are employees for whom travel is an integral part of their jobs, such as those who travel to different locations to perform their duties, as differentiated from employees who commute daily from home to a single workplace." Boyce, 642 A.2d at 1343. "[I]t is the job's requirement of travel and the employer's authority and control in assigning its employees to different work sites that increase the normal risk," such that the employee's travel cannot fairly be excluded from a classification of work-related risks. Id. at 1344 (emphasis omitted); see also Murphy, 128 N.H. at 646 ("[A]lthough employment may occur . . . [at] anytime, it does not occur without a call or a requirement to perform some activity integrally related to the object of the employment relationship." (emphasis added)).

The Carrier contends that the decedent cannot be deemed a "traveling employee," such that injuries incurred while traveling could be deemed work-related, because he was not on a business trip that required an overnight stay. The Carrier argues that expanding the definition of a traveling employee to cover the decedent would impermissibly create "portal-to-portal" coverage for "all employees . . . [who] need to commute to and from work." We are not persuaded.

In Appeal of Griffin, we determined that the employee's situation was that of a traveling employee. Appeal of Griffin, 140 N.H. at 654-57. The employee's demolition work entailed traveling to "various locations, including Maine, Massachusetts, and Rhode Island." Id. at 652. At the time of the injury, the employee was on a two-week demolition assignment in Rhode Island that required overnight stays. Id. His employer had provided daily meal allowances and motel accommodations, and permitted the use of the company vehicle for transportation. Id. The employee was injured during an altercation between him and a colleague while driving the company vehicle after dinner one evening. Id.

We considered whether the circumstances of his injury satisfied both prongs of the Murphy test. Id. at 654-56. We held that "[b]ecause the petitioner was required by his employment to live away from home, the risk of injury to him during travel necessary to take his meals was created by his employment," thus satisfying the first prong of the Murphy test — that the

7

injury arose out of employment. Id. at 654-55. Examining the second prong of the Murphy test — that the injury arose in the course of employment — we acknowledged that when "the job requires extensive travel, the time and space criteria cannot be applied in a conventional manner." Id. at 656 (quotation omitted). We held that the employee's injury satisfied those criteria because it occurred while "returning from a meal on the road necessitated by the condition of being employed away from home." Id. Additionally, we concluded that the injury occurred in the performance of an activity related to employment, because the employer's provision of a meal allowance and a company vehicle indicated the employee's personal activity of dining out was reasonably expected and not forbidden by the employer. Id. The employee's injury, therefore, arose in the course of employment. Id. at 657.

Here, as demonstrated by the CAB's factual findings which are supported by evidence in the record, the decedent's situation was that of a traveling employee. See id. at 655-56; see also Whittemore, 129 N.H. at 436-37. His employment with Pelmac involved extensive travel throughout New Hampshire, and he usually traveled directly between the remote work sites and his home in a company van. The decedent's travel between his home and these remote work sites, including that during the June 4-5 work assignment in Berlin, was integral to his role as an alarm installer and technician for the company. Additionally, the decedent's travel was required not only during his regular schedule of four, 10-hour days, but also while he was on call before and after hours as well.[3]

Having determined that the decedent's situation was that of a traveling employee, we turn to our Murphy scope-of-employment test. See Murphy, 128 N.H. at 645-46; Appeal of Griffin, 140 N.H. at 655. The CAB found that the decedent's injury from the June 5 motor-vehicle accident involved risk "directly associated with employment." See Appeal of Margeson, 162 N.H. at 277-78 (setting forth the framework for classifying risks to determine whether an injury arises out of employment). This finding is supported by the record. The decedent's work, as an alarm installer and technician, "involved traveling long distances, working on site, and returning to Manchester." In this case, the decedent used a company-issued van to travel directly from his home to the work site in Berlin and back again. The "risk of injury to [the decedent] during travel necessary to [perform his duties as an alarm installer and technician at assigned, remote work sites] was created by his employment." Appeal of Griffin, 140 N.H. at 655. Accordingly, the decedent's injuries sustained on

---

[3] The fact that the decedent's travel time home would not have been considered "hours worked" under New Hampshire Administrative Rules, Lab 803.04 is irrelevant; and, contrary to the Carrier's position, the CAB committed no error by failing to discuss this rule in its decision. The Carrier's arguments related to "travel time" are without merit and do not warrant further discussion. See Vogel v. Vogel, 137 N.H. 321, 322 (1993).

8

June 5 while traveling home from the work site in Berlin satisfy the first prong of the Murphy test — as arising out of employment by resulting from a risk created by employment. Murphy, 128 N.H. at 645.

Contrary to the Carrier's argument on appeal, the record did not compel the CAB to classify the decedent's sleep apnea as a "personal risk" that resulted in the June 5 accident. Personal risks "are so clearly personal that, even if they take effect while the employee is on the job, they could not possibly be attributed to the employment." Appeal of Margeson, 162 N.H. at 277-78 (quotation omitted). Though the record establishes that the decedent had sleep apnea, the CAB's finding that "[t]here was no explanation of why the van left the road," is not, as the Carrier contends, inconsistent with the statement of the decedent's neurologist that "[t]he accident might have been related to sleep apnea" (emphasis added), or that there was evidence that the decedent had not used his CPAP machine in the nights leading up to the accident. That same neurologist expressly noted that the cause of the accident was "unknown," that the decedent had obtained five to seven hours of sleep for the two days prior to the accident, and that the decedent did not note drowsiness the day of the accident. The Carrier has not demonstrated that the CAB erred in failing to attribute the cause of the June 5 accident to the decedent's sleep apnea. See Appeal of Dean Foods, 158 N.H. at 474 (we will not reweigh the evidence, and will instead determine whether the CAB's findings are supported by competent evidence in the record).

The decedent's injury suffered on June 5 also satisfies the second prong of the Murphy test — as arising in the course of his employment. See Murphy, 128 N.H. at 645. The decedent's travel to and from Berlin was necessitated by, and integral to, the nature of the decedent's employment with Pelmac such that his June 5 injury occurred within the boundaries of time and space created by the terms of employment. See, e.g., Appeal of Griffin, 140 N.H. at 656. Furthermore, the decedent usually traveled between remote work sites and his home in a company van, as he did for the Berlin assignment. Thus, his travel home from the Berlin work site on June 5 was related to his employment or an activity of mutual benefit to the employer and employee. See Whittemore, 129 N.H. at 436-37 (concluding the employee's injury sustained while returning from her lunch break and attempting to resume her travel to a client's home, arose from an activity related to employment where her lunch break was "an activity expected and permitted by her supervisor," and "her activity was not exclusively personal"); cf. Murphy, 128 N.H. at 646 (concluding that an employee's injury, which occurred during a voluntary softball game, was not integral to his employment as a firefighter and, therefore, did not occur within the time and space associated with his employment). We conclude that the Carrier has not demonstrated that the CAB erred in finding that the decedent's June 5 injury was work-related. See Appeal of LeBorgne, 173 N.H. at 493.

IV

We now turn to the decedent's subsequent death by suicide. The death benefits provision of the Workers' Compensation Law states, in pertinent part, that "[i]f death results from an injury, . . . compensation shall be paid to the dependents of the deceased employee." RSA 281-A:26. An "injury," as used in and covered by the Workers' Compensation Law, is defined in pertinent part as an:

> accidental injury or death arising out of and in the course of employment, or any occupational disease or resulting death arising out of and in the course of employment . . . . No compensation shall be allowed to an employee for injury proximately caused by the employee's willful intention to injure himself . . . .

RSA 281-A:2, XI. There are two contemplated injuries at issue in this case: the original injury on June 5 and the decedent's death on September 2. It is well established that an employer remains liable for subsequent injuries that are the "direct and natural result" of a prior, work-related injury. See, e.g., Appeal of Bergeron, 144 N.H. 681, 684 (2000). However, the presence of an independent, intervening cause interrupts the direct and natural connection needed between the prior and subsequent injury to establish compensability for the latter. See Appeal of Bergeron, 144 N.H. at 684-85. An employee's willful act may constitute an independent, intervening cause of a subsequent injury, thus barring compensability for that injury. See id.; RSA 281-A:2, XI (establishing employee's "willful intention to injure himself" as a bar to compensation); see also RSA 281-A:14 (2010) (contemplating employee's intoxication or "serious and willful misconduct" as a bar to compensation). The question before us, therefore, is whether the decedent's death was the direct and natural result of the June 5 injury or whether it resulted from an independent, intervening cause. See Appeal of Bergeron, 144 N.H. at 684.

The Carrier argues that the CAB failed to address whether the decedent's death was a direct and natural result of the June 5 injury and failed to consider whether the act of suicide itself was an intervening event that caused the decedent's death. The Carrier relatedly argues that the decedent's death is not an "injury" under RSA 281-A:2, XI because his death was caused by his willful intention to injure himself.

We have not had occasion to consider whether and under what circumstances suicides can be deemed to result from a prior, work-related injury and deemed not to be the product of the employee's "willful" intent or conduct, as relevant to awards of death benefits. See RSA 281-A:26; see also RSA 281-A:2, XI. The majority of jurisdictions in which the "workers' compensation statutes contain an exclusion for wilfully, purposefully or intentionally self-inflicted injury or death" have adopted the "chain-of-

causation" test as the proper standard for interpreting the operative term "wilful," "purposeful," or "intentional," and for ultimately determining the compensability of an employee's death by suicide.  Kahle v. Plochman, Inc., 428 A.2d 913, 916 (N.J. 1981); see, e.g., Graver Tank & Mfg. Co. v. Industrial Commission, 399 P.2d 664, 667-68 (Ariz. 1965); Delaware Tire Ctr. v. Fox, 401 A.2d 97, 100 (Del. Super. 1979), aff'd, 411 A.2d 606 (Del. 1980); Meils by Meils v. Northwestern Bell, 355 N.W.2d 710, 715 (Minn. 1984); Campbell v. Young Motor Co., 684 P.2d 1101, 1103 (Mont. 1984); Vredenburg v. Sedgwick CMS, 188 P.3d 1084, 1090 (Nev. 2008); Borbely v. Prestole Everlock, Inc., 565 N.E.2d 575, 578 (Ohio 1991); Matter of Death of Stroer, 672 P.2d 1158, 1161 (Okl. 1983); see also Kealoha v. Director, Office of Workers, 713 F.3d 521, 524-25 (9th Cir. 2013).  The chain-of-causation test addresses the requisite causal connection between the prior work-related injury and the employee's subsequent death by suicide to permit an award of workers' compensation death benefits, even where there are statutory limitations on injuries caused by an employee's willful act, as we have here in New Hampshire.  See, e.g., Vredenburg, 188 P.3d at 1088-90; see also RSA 281-A:2, XI.

The leading case espousing the chain-of-causation test is Whitehead v. Keene Roofing Co., 43 So.2d 464 (Fla. 1949) (en banc).  Kahle, 428 A.2d at 916; see Graver Tank & Mfg. Co., 399 P.2d at 668.  In Whitehead, the Supreme Court of Florida reviewed a widow's claim for death benefits under a statutory provision that precluded compensation for injuries "occasioned primarily by the willful intention of the employee to injure or kill himself."  Whitehead, 43 So.2d at 465 (ellipsis and quotation omitted).  In determining that the death by suicide was compensable, the court explained that the employee's death by suicide was directly attributable to the mental disturbance that arose out of physical injuries he sustained in a work-related fall.  Id. at 465-66.  The court reasoned that, "in those cases where the injuries suffered by the deceased result in his becoming devoid of normal judgment and dominated by a disturbance of mind directly caused by his injury and its consequences, his suicide cannot be considered 'wilful' within the meaning and intent of the Act."  Id. at 465.

"The issue of the compensability of an employee suicide under the Whitehead standard turns not on the employee's conscious volition or knowledge of the consequences of his act, but rather on the existence of an unbroken chain of causation from the work-connected injury to the suicide."  Kahle, 428 A.2d at 916; see Meils by Meils, 355 N.W.2d at 714; Campbell, 684 P.2d at 1102.  "If a work-related injury has produced a [disturbance of mind] such that at the time of the suicide the employee does not have conscious or rational control over his actions, his realization that his action is self-destructive is not a[n] [independent, intervening] cause of his death."  Meils by Meils, 355 N.W.2d at 714-15.  When the chain-of-causation test is satisfied, "the suicide [is] merely an act intervening between the injury and the death,

and part of an unbroken chain of events from the injury to the death, and not a <u>cause</u> intervening between the injury and death." <u>Whitehead</u>, 43 So.2d at 465.

Though the chain-of-causation test is stated with slight variations across jurisdictions, it essentially "places the burden on the claimant to prove by a preponderance of the evidence that there was an unbroken chain of causation between the [work-related] injury, the disturbance of mind, and the ultimate suicide." <u>Matter of Death of Stroer</u>, 672 P.2d at 1161; <u>see</u> <u>Kahle</u>, 428 A.2d at 916. The chain-of-causation test is the proper standard for determining the compensability of a death by suicide under New Hampshire's Workers' Compensation Law. It aligns with the law's remedial purpose, <u>see</u> <u>Appeal of Griffin</u>, 140 N.H. at 654, "is widely recognized to accord with principles of modern medicine," <u>Vredenburg</u>, 188 P.3d at 1090, and "recognizes that the injury and the post-injury trauma, mental as well as physical, may take a path anticipated by no one, but nonetheless [may] be traceable to the injury itself," <u>Campbell</u>, 684 P.2d at 1103.

Accordingly, we join the majority of jurisdictions that apply the chain-of-causation test and adopt the following test in New Hampshire: An employee's death by suicide is compensable under RSA 281-A:26 if the claimant proves by a preponderance of the evidence that the suicide resulted from a disturbance of mind of such severity as to override normal, rational judgment, and that such disturbance of mind resulted from the employee's work-related injury and its consequences. <u>See</u> RSA 281-A:26; <u>Vredenburg</u>, 188 P.3d at 1089-90; <u>Kahle</u>, 428 A.2d at 917; <u>Whitehead</u>, 43 So.2d at 465; <u>see also</u> <u>Appeal of Kehoe</u>, 141 N.H. 412, 416 (1996) (causal relationship between work and injury is generally proven by a preponderance of the evidence).

Under such circumstances, an employee's death by suicide is not to be deemed as resulting from an employee's willful intent or conduct, even though the act of suicide itself may be volitional. <u>See</u> <u>Kahle</u>, 428 A.2d at 917; <u>Matter of Death of Stroer</u>, 672 P.2d at 1161; <u>see also</u> RSA 281-A:2, XI. We agree with the majority of jurisdictions that focusing on an employee's conscious volition and knowledge of the physical consequences of the act of suicide wrongly ignores the role that severe or extreme pain, anxiety, despair, or depression may play in the deterioration of a person's rational mental process. <u>See</u> <u>Kahle</u>, 428 A.2d at 917.

We conclude that an employee's death by suicide is deemed to be the direct and natural result of the prior work-related injury when the chain-of-causation test is satisfied. <u>See</u> RSA 281-A:26; <u>see also</u> <u>Appeal of Bergeron</u>, 144 N.H. at 684-85 (a subsequent injury is compensable if it was the direct and natural result of an initial work-related injury). As in other subsequent-injury situations, the prior work-related injury need not be the sole cause of the subsequent death by suicide, but the death by suicide must be the direct and

natural result of the prior work-related injury — a determination now established by satisfying the chain-of-causation test.  See Appeal of Bergeron, 144 N.H. at 684-86.

The Carrier maintains that the decedent's suicide is not compensable because the act of suicide, itself, constituted an independent, intervening act and cites our decision in Bruzga v. PMR Architects, 141 N.H. 756, 757 (1997), for support.  In Bruzga, we explained that, in the context of a wrongful death action in tort, the general rule is that "negligence actions seeking damages for the suicide of another will not lie because the act of suicide is considered a deliberate, intentional and intervening act which precludes a finding that a given defendant, in fact, is responsible for the harm."  Id.  We also explained that there are two recognized exceptions to the general rule of nonliability for the suicide of another.  Id. at 758.  The two exceptions include when "the defendant actually causes the suicide," and when "the defendant has a specific duty of care to prevent suicide, arising from the defendant's special relationship with the suicidal individual."  Id. (quotations omitted).  Our discussion in Bruzga, however, is inapplicable here.

Bruzga concerned the extension of liability to "parties involved with the design and construction of buildings" for suicides that occurred therein.  Id. at 759.  We expressed our concern that such an extension of liability would "encourage a proliferation of attenuated claims in suicide litigation and discourage firms from contracting with the State to design and construct mental health related facilities."  Id. at 760.  Here, by contrast, we consider the compensability of deaths by suicide in the context of the Workers' Compensation Law, which serves a remedial purpose.  Appeal of Griffin, 140 N.H. at 654; see also Kahle, 428 A.2d at 917 (explaining that the chain-of-causation test "honor[s] the legislative purpose of relieving society as a whole of the burdens of supporting dependents of those whose death is caused by work-connected injuries").  The Carrier has not persuaded us that our discussion of suicide liability in Bruzga compels the conclusion that, in the workers' compensation context, the act of suicide is necessarily an "independent and intervening act" or that the chain-of-causation test is not the appropriate standard to apply.

Returning to this case, we hold that the CAB did not err in awarding death benefits to the respondent.  As explained above, the CAB determined, and we affirm, that the decedent's injuries resulting from the June 5 accident constituted a work-related injury.  The CAB found that these injuries — a neck fracture, a concussion, fractured ribs, head lacerations, and a serious rotator cuff tear — were significant and prevented the decedent from fully caring for himself and being his usual "cheerful," "confident," and "active" self.  It found that over the course of the summer the decedent's mental well-being deteriorated, he became "increasing[ly] discontent," and he was desperate to have his surgery and "be the person he once was."  It also found that his family

knew the decedent's mental well-being was getting worse, but that they did not fully recognize the degree of his "depression-like mental state." The CAB discussed how, after more than two months of living with his injuries, the decedent learned that he would have to wait at least another month before his shoulder surgery could be scheduled, news that the CAB found was "the last straw."

Further, the CAB credited Jamieson's opinion that the June 5 injury "was a substantial proximate cause" of the September 2 suicide, and found there was "an obvious cause and effect between the work accident and injuries resulting [in] the increasing despair" of the decedent and his suicide. The CAB also found that the decedent's death by suicide "was not a rational act based upon his deteriorating mental health."

Thus, we understand the CAB to have evaluated the decedent's state of mind and found that he had a disturbance of mind of such severity as to override his normal rational judgment and that there was an unbroken chain of causation between the June 5 work-related injury, his disturbance of mind, and the suicide, thereby demonstrating that the chain-of-causation test was satisfied. See Appeal of LeBorgne, 173 N.H. at 493 ("The interpretation of the CAB's decision presents a question of law, which we review de novo."). The CAB's findings are supported by competent evidence in the record — the testimony of the decedent's wife, the decedent's journal entries, and Jamieson's opinion — upon which the CAB's decision to award death benefits reasonably could have been made. See Appeal of Dean Foods, 158 N.H. at 474.

We are not persuaded by the Carrier's arguments to the contrary. The Carrier argues that the CAB erred by "disregard[ing] the medical evidence concerning the [decedent's] willful intent to injure himself." It emphasizes the fact that both experts acknowledged that the available records did not "fully" explain the decedent's suicide and the fact that neither expert explicitly opined that the decedent did not "willfully intend" to injure himself. The Carrier also contends that the CAB took "liberty and misconstrue[d] the suicide note when it sa[id] the note was 'expressing deep dissatisfaction with [the decedent's] present and future condition,'" and emphasizes the forethought taken by the decedent to write a suicide note and seal it in a plastic bag. However, under the chain-of-causation test, "[t]he employee's realization of the purpose and physical consequences of his act are irrelevant to the question of causation." Meils by Meils, 355 N.W.2d at 714. Rather, the causation analysis focuses on whether there was an unbroken chain of causation between the work-related injury, the disturbance of mind, and the suicide. See Matter of Death of Stroer, 672 P.2d at 1161.

The Carrier also claims that Jamieson's opinion "[did] not rise to the level of 'competent medical evidence,'" and asserts that his opinion was "speculative at best" and that the CAB's "reliance on his opinion [was] faulty." Despite the

14

Carrier's contention, however, Jamieson's opinion was not "speculative," but instead was based on his review of the decedent's medical records, the suicide note, the accident report, and his interview with the decedent's widow. Additionally, the CAB was free to accept or disregard the expert testimony at issue in whole or in part. See Appeal of Dean Foods, 158 N.H. at 474.

The Carrier further argues the CAB's award of death benefits was erroneous because the decedent's medical records did not show a history of depression or mental illness or that he had been diagnosed with a brain injury or a "mental or cognitive disorder." In support of its argument, the Carrier also points to the fact that the evidence shows the decedent was acting "[c]ompletely normal" on the morning of September 2 and that his wife said "nobody saw this coming." The Carrier has not demonstrated, however, why the absence of a diagnosed mental health condition in this case renders the CAB's decision erroneous, unjust, or unreasonable. See Appeal of LeBorgne, 173 N.H. at 493 (the CAB's factual findings are "prima facie lawful and reasonable").

Jamieson's opinion, which the CAB credited, concluded that the decedent sustained a traumatic brain injury affecting "areas involved with emotion control, reasoning, and judgment," and noted the "significant body of literature indicating a notably increased risk of suicidal ideation after traumatic brain injury." From this opinion, which the CAB was free to accept in whole or in part, Appeal of Dean Foods, 158 N.H. at 474, the CAB could have reasonably concluded that the decedent suffered from a disturbance of mind, supporting its conclusion that "based upon [the decedent's] deteriorating mental health" his "suicide was not a rational act." See also Campbell, 684 P.2d at 1103 (recognizing that the injury and its consequences "may take a path anticipated by no one, but nonetheless [may] be traceable to" that prior, work-related injury).

We, therefore, conclude that the Carrier has failed to demonstrate that we should not defer to the CAB's factual findings supporting its award of death benefits. See Appeal of LeBorgne, 173 N.H. at 493; Appeal of Dean Foods, 158 N.H. at 474. We affirm the CAB's determination that the decedent's death by suicide was compensable under RSA 281-A:26, concluding that its findings support a determination that the respondent proved by a preponderance of the evidence that the decedent's suicide resulted from a disturbance of mind of such severity as to override normal rational judgment, and that his disturbance of mind resulted from his June 5 work-related injury and its consequences.

V

Lastly, the Carrier argues that the CAB violated its constitutional rights to due process and guarantees of a fair and impartial hearing under the State Constitution. See N.H. CONST. pt. I, art. 35. In support of its due process

argument, the Carrier points to the CAB's statement that "it does not make sense to preclude recovery of widow's benefits in this situation," and its claims that the CAB "omit[ted] decisive facts in its decision, embellish[ed] testimony and fail[ed] to provide any relevant analysis of facts to law or address[] the Carrier's arguments in any manner." It contends, relying heavily upon our decision in Appeal of Lathrop, 122 N.H. 262, 265 (1982), that the CAB's decision "shows a predetermined purpose to reach a determined end." (Quotation omitted.) We disagree.

That a governmental tribunal must utilize fair procedures is elemental; and it is well established that due process guarantees apply to administrative agencies. Id. "Although there is a presumption of regularity and impartiality attending the actions of an administrative agency, it is a rebuttable one." Id. (citing Hortonville Dist. v. Hortonville Ed. Assn., 426 U.S. 482, 497 (1976)). In Appeal of Lathrop, we held that the appellants were denied due process by the New Hampshire Water Resources Board. Id. at 266. The board determined, after a hearing, that a hydro-generation project was in the public interest. Id. However, in the two years prior to the hearing, the board "endorsed the project," gave itself sole authority over the project's premises so it could "move forward," and urged the Governor and Council to approve the project. Id. at 264. We concluded that, given the "entire series of events contained in the record," the appellants made a "sufficiently strong showing that the [board] had determined the outcome prior to the hearing and decision." Id. at 266.

The Carrier's attempt to analogize the CAB's decision here to the circumstances at issue in Appeal of Lathrop is unpersuasive. Unlike Appeal of Lathrop, the Carrier has not pointed to anything in the record which suggests that the CAB sought to reach a predetermined result. Further, reading the CAB's order as a whole, which includes its legal and factual reasoning, we are unpersuaded that it evidences an intent to reach a certain result. The Carrier has, therefore, failed to rebut the "presumption of regularity and impartiality attending" the CAB's actions. Id. at 265.

We conclude that the Carrier's remaining arguments are without merit and otherwise do not warrant further discussion. See Vogel v. Vogel, 137 N.H. 321, 322 (1993).

VI

In sum, we affirm the CAB's decision to award death benefits to the respondent, having concluded that the CAB did not err in finding that the June 5 injury was a work-related injury and that the decedent's death by suicide sufficiently resulted from that original injury. See RSA 281-A:26; Appeal of LeBorgne, 173 N.H. at 493; Appeal of Bergeron, 144 N.H. at 685-86. Our newly articulated chain-of-causation test applies to determine the compensability of an employee's death by suicide that follows the employee's

work-related injury under New Hampshire's Workers' Compensation Law. When satisfied, the test establishes that the death by suicide is the direct and natural result of the prior work-related injury, and that the act of suicide is not an independent, intervening cause of the employee's death, as a willful act. See Appeal of Bergeron, 144 N.H. at 685-86; see also RSA 281-A:2, XI. We also conclude that the CAB did not violate the Carrier's due process rights.

Affirmed.


HICKS, BASSETT, and DONOVAN, JJ., concurred.